Robert V. Prongay (SBN 270796)
*rprongay@glancylaw.com*
Ex Kano S. Sams II (SBN 192936)
*esams@glancylaw.com*
Charles H. Linehan (SBN 307439)
*clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
*prajesh@glancylaw.com*
GLANCY PRONGAY WOLKE & ROTTER LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Sidney Hsu and for the Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SIDNEY HSU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PUBMATIC, INC., RAJEEV K. GOEL, and STEVEN PANTELICK,<br><br>Defendants. | Case No. 3:25-cv-07067-JSC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Lead Plaintiff Sidney Hsu ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by PubMatic, Inc. ("PubMatic" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a securities class action on behalf of all persons and entities who purchased the Company's securities between February 27, 2025 and August 11, 2025, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. PubMatic is a technology company that enables real time programmatic advertising transactions for advertisers, agencies, and demand side platforms ("DSPs"). Programmatic advertising purportedly enables buyers to purchase ad impressions on publisher supplied inventory within milliseconds in a sophisticated, technology-driven marketplace. The Company primarily generates its revenue from the use of its platform for the purchase and sale of digital advertising inventory.

3. On August 11, 2025, PubMatic released its second quarter 2025 financial report. In its report, PubMatic's Chief Financial Officer ("CFO"), Steven Pantelick ("Pantelick"), revealed that the Company's outlook reflected "***a reduction in ad spend from one of [its] top DSP partners.***" The Company's Chief Executive Officer ("CEO"), Rajeev Goel ("Goel"), further revealed that a "top DSP buyer" had "shifted a significant number of clients to a new platform that evaluates inventory differently" causing significant headwinds. In response to the inventory valuation change, CEO Goel stated further that the Company would "need to do a better job . . . to prioritize across all

the hundreds of billions of daily ad impressions that we have, which subset of those impressions that we send to this DSP."

4. On this news, PubMatic's stock price fell $2.23, or 21.1%, to close at $8.34 per share on August 12, 2025, on unusually heavy trading volume.

5. As demonstrated herein, Defendants had long known about the Company's DSP problems before the Company's August 11, 2025 press release. Indeed, in 2024, the Company had conversations with The Trade Desk (one of the Company's top DSP partners) wherein The Trade Desk informed PubMatic that the Company was "being de-prioritized." Also in 2024, The Trade Desk informed PubMatic that it was creating "direct integrations" that would lessen the demand for PubMatic's product. During meetings that involved these conversations, The Trade Desk informed PubMatic that the Company's quality of inventory was not as good as Magnite, Inc. ("Magnite") (one of PubMatic's competitors), and that PubMatic was not as good in over-the-top video/connected TV ("OTT/CTV"). Through these conversations, it became clear to PubMatic that The Trade Desk was trying to eliminate the Company as a supply-side platform ("SSP").

6. Furthermore, the Company's DSP problems were discussed in internal global meetings that were attended by CEO Goel. For example, in 2024, PubMatic saw a big impact on monetization because of the Company's problems with DSPs, and it was evident at that time that PubMatic was not growing as fast as it had in previous years. PubMatic's problems with DSPs were also discussed in weekly product management meetings, which were also attended by CEO Goel. In 2024, there were huge projects around the reprioritization of traffic to The Trade Desk that made it clear that PubMatic was experiencing significant risks because of the Company's problems with DSPs. In fact, Company employees frequently expressed concerns during these meetings regarding these issues and conveyed that the Company's publishing demand was decreasing and that PubMatic faced serious challenges related to revenue as a result.

7. Moreover, as indicated by a former company employee, internal Company documents further demonstrate that Defendants were aware of, and had access to, information showing the adverse effects that the Company's problems with DSPs were having upon PubMatic's financial results. For instance, PubMatic's minutes for the Company's global meetings and weekly product management meetings reflect discussions related to PubMatic's problems with DSPs in general and with The Trade Desk in particular. Additionally, internal revenue reports demonstrate a decrease in the Company's revenue from DSPs, which Defendants tracked daily.

8. Thus, throughout the Class Period, Defendants made materially false and misleading statements and half-truths, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that a top DSP buyer was shifting a significant number of clients to a new platform that evaluated inventory differently; (2) that, as a result, PubMatic was seeing a reduction in ad spend and revenue from this top DSP buyer; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

9. As a result of Defendants' misrepresentations and half-truths, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

12. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

**PARTIES**

14. As set forth in the previously filed certification that is incorporated by reference herein (ECF No. 1 at 22-23), Plaintiff purchased the Company's securities during the Class Period and has been damaged thereby.

15. Defendant PubMatic is incorporated under the laws of Delaware. The Company maintains a headquarters location in Redwood City, California. PubMatic's common stock trades on the NASDAQ exchange under the symbol "PUBM."

16. Defendant Rajeev K. Goel ("Goel") was the Company's CEO at all relevant times.

17. Defendant Steven Pantelick ("Pantelick") was the Company's CFO at all relevant times.

18. Defendants PubMatic, Goel, and Pantelick are collectively referred to herein as "Defendants."

19. Defendants Goel and Pantelick are collectively referred to herein as the "Individual Defendants."

20. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business

prospects. Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company. Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21. The Individual Defendants are liable as direct participants in the wrongs alleged herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

22. The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23. The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

25. PubMatic contends that its mission is to fuel the potential of Internet content creators by providing an advertisement-funded Internet. The Company represents that its integrated technology platform empowers content creators (which it refers to as "publishers") across the Internet to maximize monetization of their advertising inventory. PubMatic also claims that its

platform provides control and transparency to buyers, which includes advertisers, agencies, agency trading desks, and DSPs (which it collectively refer to as "buyers").

26. PubMatic suggests that the challenges of scale and the complexity of the digital advertising ecosystem require an automated, fast, and efficient approach to purchasing ads online, known as programmatic advertising. According to the Company, programmatic advertising, on an automated basis, enables buyers to purchase ad impressions on publisher supplied inventory within milliseconds in a sophisticated, technology-driven marketplace. PubMatic claims that with header bidding (which enables a single parallel auction by a publisher with multiple interested parties simultaneously), the industry has seen a significant increase in the number of ad impressions that need to be processed and analyzed in real-time by each participant in the digital advertising ecosystem.

27. Additionally, PubMatic contends that as consumers increasingly engage with digital media – and as advertisers bid on a growing array of ad formats and impressions – an immense amount of data is generated. According to PubMatic, this data includes anonymized consumer information about interests and intent, log files of winning and losing advertiser bids, and transaction records for billing and payment reconciliation. The Company claims that technology infrastructure platforms must rapidly process this data while offering a seamless digital ad experience. According to PubMatic, companies must continue to innovate and find efficiencies in their data processing (including through the use of machine learning and artificial intelligence) to maintain pace with growing volumes of transactions to maintain profitability.

28. PubMatic generates revenue from the use of its platform for the purchase and sale of digital advertising inventory. The Company works primarily with publishers and app developers who allow PubMatic direct access to their ad inventory, as well as select channel partners that meet the Company's quality and scale thresholds. PubMatic's channel partners aggregate and provide

further access to thousands of sites and apps from smaller publishers. The Company generates revenue through fees charged to its publishers, which are generally a percentage of the value of the advertising impressions that publishers monetize on the Company's platform. PubMatic also generates revenues from its other products such as OpenWrap, its header bidding solution, and Connect, its solution that provides additional data and insights to buyers, which are sold separate from, or in conjunction with, use of its platform. To facilitate the sale of publisher inventory, PubMatic enters into written service agreements with its buyers, primarily DSPs, that allow them to use the Company's platform to buy ad inventory. As of December 31, 2024, the Company had 1,049 employees, of whom 319 were located in the United States, 604 in India, and 126 in other offices around the world.

**Defendants' False and Misleading Statements**

29. The Class Period begins on February 27, 2025. On that day, PubMatic issued a press release announcing its financial results for the fiscal quarter ended and full year ended December 31, 2024. The press release touted the Company's purported financial results as follows, in relevant part:

> **PubMatic Announces Fourth Quarter and Fiscal Year Ended 2024 Financial Results**
>
> February 27, 2025
>
> FY Revenue of $291.3 million, up 9% over 2023; Delivered FY 2024 net income of $12.5 million or 4% margin;
>
> FY adjusted EBITDA increased 23% over 2023 and was $92.3 million or 32% margin;
>
> Revenue in Q4 from CTV more than doubled year over year and represented 20% of total revenue;

Supply Path Optimization represented 53% of total activity in 2024;

Repurchased 4.3 million shares in 2024, representing 7.9% of fully diluted shares as of December 31, 2024

NO-HEADQUARTERS/REDWOOD CITY, Calif., Feb. 27, 2025 (GLOBE NEWSWIRE) -- PubMatic, Inc. (Nasdaq: PUBM), an independent technology company delivering digital advertising's supply chain of the future, today reported financial results for the fourth quarter and fiscal year ended December 31, 2024.

***"Revenue growth in the year more than doubled over 2023, driven by strength in CTV, emerging revenue streams, and marquee customers choosing PubMatic to build and scale their ad businesses.*** Our revenue mix is evolving; in the fourth quarter, CTV more than doubled to 20% of total revenue. These achievements mark an inflection point in our underlying business that highlights critical scale on our platform and a significant shift in ad buying toward channels with the highest consumer engagement such as CTV, mobile app and commerce media," said Rajeev Goel, co-founder and CEO at PubMatic. "Today, our omnichannel platform serves publishers, media buyers, commerce media networks, and curation/data providers, all of which are turning to sell side technology for critical end-to-end solutions needed to build their ad businesses. As we look to 2025, we expect accelerated growth in our underlying business as ad buyers seek premium, brand safe, curated inventory in the open internet."

**PUBMATIC, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except par values)**

| | December 31, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 100,452 | $ 78,509 |
| Marketable securities | 40,135 | 96,835 |
| Accounts receivable, net | 424,814 | 375,468 |
| Prepaid expenses and other current assets | 10,145 | 11,143 |
| Total current assets | 575,546 | 561,955 |
| Property, equipment and software, net | 58,522 | 60,729 |
| Operating lease right-of-use assets | 44,402 | 21,102 |
| Acquisition-related intangible assets, net | 4,284 | 5,864 |
| Goodwill | 29,577 | 29,577 |
| Deferred tax assets | 24,864 | 13,880 |
| Other assets, non-current | 2,324 | 2,136 |

| | | |
|---|---|---|
| TOTAL ASSETS | $ 739,519 | $ 695,243 |

* * *

**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share data)**
**(unaudited)**

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | **2024** | **2023** | **2024** | **2023** |
| Revenue | $ 85,502 | $ 84,600 | $ 291,256 | $ 267,014 |
| Cost of revenue | 24,935 | 24,208 | 101,027 | 99,229 |
| Gross profit | 60,567 | 60,392 | 190,229 | 167,785 |
| Operating expenses: | | | | |
| Technology and development | 7,831 | 6,846 | 33,263 | 26,727 |
| Sales and marketing | 23,763 | 20,353 | 95,369 | 82,803 |
| General and administrative | 14,171 | 12,780 | 57,670 | 56,219 |
| Total operating expenses | 45,765 | 39,979 | 186,302 | 165,749 |
| Operating income | 14,802 | 20,413 | 3,927 | 2,036 |
| Total other income, net | 3,618 | 2,632 | 13,847 | 8,469 |
| Income before income taxes | 18,420 | 23,045 | 17,774 | 10,505 |
| Provision for income taxes | 4,521 | 4,343 | 5,270 | 1,624 |
| Net income | $ 13,899 | $ 18,702 | $ 12,504 | $ 8,881 |
| Net income per share attributable to common stockholders: | | | | |
| Basic | $ 0.29 | $ 0.37 | $ 0.25 | $ 0.17 |
| Diluted | $ 0.26 | $ 0.34 | $ 0.23 | $ 0.16 |
| Weighted-average shares used to compute net income per share attributable to common stockholders: | | | | |
| Basic | 47,993 | 50,659 | 49,213 | 51,760 |
| Diluted | 52,623 | 54,940 | 54,294 | 56,027 |

30. On February 27, 2025, the Company submitted its annual report for the fiscal year ended December 31, 2024 on a Form 10-K filed with the SEC ("FY24 10-K"). The FY24 10-K

affirmed the previously reported financial results. The FY24 10-K further stated the following regarding the Company's disclosure controls and procedures, as follows, in relevant part:

> **ITEM 9A. CONTROLS AND PROCEDURES**
>
> **Evaluation of Disclosure Controls and Procedures**
>
> Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our principal executive officer and principal financial officer have concluded that, as of such date, ***our disclosure controls and procedures were effective at a reasonable assurance level.***

31. The FY24 10-K stated the following regarding purported risks to the Company which "***could***" or "***may***" negatively impact results, in relevant part:

> ***Our software platform could be susceptible to errors, defects, or unintended performance problems that could adversely affect our business, results of operations, and financial condition.***
>
> We depend upon the sustained and uninterrupted performance of our platform to operate our business. Software bugs, faulty algorithms, technical or infrastructure problems, or system updates could lead to an inability to process data to place advertisements or price inventory effectively, or cause advertisements to display improperly or be placed in proximity to inappropriate content, which could adversely affect our business, results of operations, and financial condition. These risks are compounded by the complexity of our technology and the large amounts of data we utilize. Because our software is complex, undetected material defects, errors and failures may occur. Despite testing, errors or bugs in our software may not be found until the software is in our live operating environment.
>
> For example, changes to our solution have in the past caused errors in the measurements of transactions conducted through our platform, resulting in disputes raised by publishers. Errors or failures in our offerings, even if caused by the implementation of changes by publishers or partners to their systems, could also result in negative publicity, damage to our reputation, loss of or delay in market acceptance of our offerings, increased costs or loss of revenue, or loss of competitive position. As a result, defects or errors in our products or services could harm our reputation, result in significant costs to us, impair the ability of publishers to sell and for buyers to purchase inventory, and impair our ability to fulfill obligations with publishers and partners. Any significant interruptions could adversely affect our business, results of operations, and financial condition.
>
> ***Our continued business success depends upon our ability to offer high-quality inventory with appropriate viewability capabilities.***
>
> We must address quality concerns of both advertisers and publishers. Publishers require ad quality tools that enable granular control over the characteristics of the ads that run on their ad impressions, including those relating to the advertiser, industry and content for a particular ad. We must also provide automatic or ad hoc blocking

of ads that contain malware or other ads the publisher deems undesirable. Our inventory quality tools must continue to help publishers demonstrate the value and quality of their ad impressions to DSPs, advertisers, and agencies with automated fraud detection and viewability reporting. Maintaining and upgrading our capabilities associated with ad quality and inventory quality is complex and costly. Maintaining high-quality inventory may become increasingly difficult with the advent and proliferation of "deep fake" video and other media produced using artificial intelligence ("AI"). If we fail to maintain high quality controls for our publishers and partners, our business, results of operations, and financial condition could be adversely affected.

32. The FY24 10-K also stated the following:

***Our revenue and results of operations are highly dependent on the overall demand for advertising.***

Our business depends on the overall demand for advertising and on the economic health of our current and prospective publishers and buyers. In recent years, macroeconomic factors such as inflation, rising interest rates and softening demand in certain verticals caused some advertisers to reduce their advertising budgets. Such macroeconomic factors, as well as broader economic downturns, recessions, inflation, further changes in interest rates or foreign exchange rates or any supply chain disruptions, changes in the tax treatment of advertising expenses, or general uncertainty, in North America, Europe, and Asia, where we do most of our business; could adversely affect our business, results of operations, and financial condition. In addition, the conflict in Ukraine and the resumption of the conflict in Israel could cause unpredictable economic effects in Europe and EMEA, including potentially softening general consumer demand. Such conflicts have increased costs of labor and other items impacting our cost of revenue, and these conflicts and potential others may do so in the future. ***Reductions in overall advertising spending due to these factors could make it difficult to predict our revenue and could adversely affect our business, results of operations, and financial condition.***

***If our existing customers do not expand their usage of our platform, or if we fail to attract new publishers and buyers, our growth will suffer. Moreover, any decrease in the use of the advertising channels that we primarily depend on, or failure to expand into emerging channels, could adversely affect our business, results of operations, and financial condition.***

We depend upon our buyer and publisher relationships, including channel partners, which aggregate large numbers of smaller publishers, to provide advertising space which we can offer to prospective buyers to continue to grow the usage of our platform. In doing so, we compete for both supply and demand with larger, well-established companies that may have technological or other advantages stemming from their broader experience in the market. We must continue to adapt and improve our technology to compete effectively, and customers have not always embraced our offerings due to various factors, including switching costs from moving away from pre-existing technology integrations, such as already implemented header bidding wrappers, and lack of awareness of our omnichannel offerings. Although we believe we provide superior transparency and accountability to such competitors, certain customers may make technological or financial demands that we are unable or unwilling to meet. These and other factors may make it difficult for us to increase our business with our publishers and buyers, cause some buyers to reduce their spending with us, or increase our costs of doing business, which could adversely affect our business, results of operations, and financial condition.

***A relatively small number of premium publishers have historically accounted for a significant portion of the ad impressions sold on our platform, as well as a significant portion of our revenue from publishers, including a relatively small number of channel partners.***

We generally do not have minimum commitments from publishers. ***As a result, the amount, quality, and cost of ad impressions available to us can change at any time with little or no prior notice, and we cannot assure you that we will have access to a consistent volume or quality of ad impressions at a reasonable cost, or at all. We depend upon a relatively small number of premium publishers and channel partners and expect to continue to do so for the foreseeable future. To support our continued growth, we seek to add additional publishers and buyers to our platform and to expand current utilization with our existing publishers and buyers. Any disruptions in our relationships with premium publishers, buyers, or our largest channel partners could adversely affect our business, results of operations, and financial condition. If we cannot retain or add individual publishers with valuable ad impressions, or if such publishers decide not to make their valuable ad impressions available to us, then our buyers may be less inclined to use our platform, which could adversely affect our business, results of operations, and financial condition.***

***A limited number of large demand side platforms ("DSPs") – The Trade Desk and Google DV360 in particular – account for a significant portion of the ad impressions purchased on our platform.*** We depend upon these DSPs for a large percentage of impressions purchased and expect to do so for the foreseeable future. ***We have no minimum commitments from buyers to spend on our platform, so the amount of demand available to us can change at any time with little or no prior notice, and we cannot assure you that we will have access to a consistent volume or quality of ad campaigns or demand for our ad impressions at a reasonable price, or at all. Any disruptions in our relationships with DSPs, agencies, advertisers, or buyers could adversely affect our business, results of operations, and financial condition. If a buyer or group of buyers representing a significant portion of the demand in our marketplace decides to materially reduce use of our platform, it could cause an immediate and significant decline in our revenue and profitability and adversely affect our business, results of operations, and financial condition. In addition, our business results, including revenues, may be impacted by changes in their pricing strategies, bidding algorithms, or go-to-market efforts.***

Historically, our buyers have predominantly used our platform to purchase mobile, display, and video advertising inventory from our publishers. We expect that these will continue to be significant channels used by our customers for digital advertising in the future. We also believe that our revenue growth may depend on our ability to expand within mobile, video, and in particular, CTV, and we are continuing to enhance such channels. ***We may not be able to accurately predict changes in overall advertiser demand for the channels in which we operate and cannot assure you that our investment in formats will correspond to any such changes or shifts in demand. Any decrease in the use of mobile, display, and video advertising, whether due to customers losing confidence in the value or effectiveness of such channels, regulatory restrictions or other causes, or any inability to further penetrate CTV or enter new and emerging advertising channels, could adversely affect our business, results of operations, and financial condition.***

33. On May 8, 2025, PubMatic issued a press release announcing its financial results for the fiscal quarter ended March 31, 2025. The press release touted the Company's purported financial results as follows, in relevant part:

**PubMatic Announces First Quarter 2025 Financial Results; Board of Directors Authorizes $100M Expansion of Share Repurchase Program**

May 8, 2025

Delivered revenue and adjusted EBITDA ahead of guidance;

Revenue from omnichannel video, including CTV, grew 20% and was 40% of total revenue;

CTV revenue grew over 50% year-over-year; and

Supply Path Optimization represented a record 55%+ of total activity

NO-HEADQUARTERS/REDWOOD CITY, Calif., May 08, 2025 (GLOBE NEWSWIRE) -- PubMatic, Inc. (Nasdaq: PUBM), an independent technology company delivering digital advertising's supply chain of the future, today reported financial results for the first quarter ending March 31, 2025.

"We are pleased with our Q1 performance, exceeding guidance on both the top and bottom line driven by the secular growth areas in our business. Ongoing investments in product innovation and go to market teams drove 21% year over year growth in our underlying business, with momentum carrying into April," said Rajeev Goel, co-founder and CEO at PubMatic. "We firmly believe the current environment serves as a catalyst to accelerate the shift to programmatic and AI-driven solutions. Sell-side activation is emerging as the preferred model across the open internet as advertiser demand for more transparent, performant paths to inventory and data continues to increase. PubMatic sits at the forefront of this transformation while creating value for the entire supply chain."

**PUBMATIC, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED BALANCE SHEETS**
**(In thousands, except par values)**

| | March 31, 2025 (unaudited) | December 31, 2024 |
|---|---|---|
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $ 101,811 | $ 100,452 |
| Marketable securities | 42,315 | 40,135 |

| | | |
|---|---|---|
| Accounts receivable, net | 349,123 | 424,814 |
| Prepaid expenses and other current assets | 12,018 | 10,145 |
| Total current assets | 505,267 | 575,546 |
| Property, equipment and software, net | 54,386 | 58,522 |
| Operating lease right-of-use assets | 42,575 | 44,402 |
| Acquisition-related intangible assets, net | 3,889 | 4,284 |
| Goodwill | 29,577 | 29,577 |
| Deferred tax assets | 29,619 | 24,864 |
| Other assets, non-current | 3,289 | 2,324 |
| TOTAL ASSETS | $ 668,602 | $ 739,519 |

34. On May 8, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report stated the following regarding the Company's disclosure controls and procedures as follows in relevant part:

**PUBMATIC, INC. AND SUBSIDIARIES**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except per share data)**
**(Unaudited)**

| | Three Months Ended March 31, | |
|---|---|---|
| | 2025 | 2024 |
| Revenue | $ 63,825 | $ 66,701 |
| Cost of revenue | 25,588 | 25,424 |
| Gross profit | 38,237 | 41,277 |
| Operating expenses: | | |
| Technology and development | 8,772 | 7,960 |
| Sales and marketing | 26,799 | 24,815 |
| General and administrative | 14,569 | 14,027 |
| Total operating expenses | 50,140 | 46,802 |
| Operating loss | (11,903) | (5,525) |
| Interest income | 1,593 | 2,564 |

| | | | | |
|---|---|---|---|---|
| Other income (expense), net | | (1,014) | | 258 |
| Loss before income taxes | | (11,324) | | (2,703) |
| Benefit from income taxes | | (1,838) | | (249) |
| Net loss | $ | (9,486) | $ | (2,454) |
| | | | | |
| Basic net loss per share of Class A and Class B stock | $ | (0.20) | $ | (0.05) |
| Diluted net loss per share of Class A and Class B stock | $ | (0.20) | $ | (0.05) |
| Weighted-average shares used to compute net loss per share attributable to common stockholders: | | | | |
| Basic | | 48,346 | | 50,039 |
| Diluted | | 48,346 | | 50,039 |

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our principal executive officer and principal financial officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of March 31, 2025. Based on such evaluation, our principal executive officer and principal financial officer have concluded that, as of such date, ***our disclosure controls and procedures were effective at a reasonable assurance level.***

35. With the Form 10-Q, the Company also stated the following:

***Our revenue and results of operations are highly dependent on the overall demand for advertising.***

Our business depends on the overall demand for advertising and on the economic health of our current and prospective publishers and buyers. In recent years, macroeconomic factors such as general economic volatility, recessionary fears, inflation, volatile interest rates and softening demand in certain verticals caused some advertisers to reduce their advertising budgets. Such macroeconomic factors, as well as broader economic downturns, recessions, transnational trade wars or disruptions, inflation, further volatility in interest rates or foreign exchange rates or any supply chain disruptions, changes in the tax treatment of advertising expenses, or general financial uncertainty in North America, Europe, and Asia, where we do most of our business; could adversely affect our business, results of operations, and financial condition. In addition, the conflict in Ukraine and the resumption of the conflict in Israel could cause unpredictable economic effects in Europe and EMEA, including potentially softening general consumer demand. Such conflicts may increase costs of labor and other items impacting our cost of revenue, and these factors and potential others may do so in the future. ***Reductions in overall advertising spending due to these factors or other factors could make it difficult to predict our revenue and could adversely affect our business, results of operations, and financial condition.***

36. The statements above in ¶¶29-35 were materially false and misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that a top DSP buyer was shifting a significant number of clients to a new platform which evaluated inventory differently; (2) that, as a result, PubMatic was seeing a reduction in ad spend and revenue from this top DSP buyer; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

37. For example, the account of a Company confidential witness ("CW") demonstrates this fact. CW1 worked as a Director of Global Support from August 2019 to June 2020 and as a Senior Director of Customer Enablement from August 2019 until April 2025. As Senior Director of Customer Enablement, CW1 managed the Company's platform capacity and oversaw the way PubMatic allocated space to publishers. CW1 reported to Jaan Janes ("Janes"), the Company's former Vice President of Publisher Partnerships. During CW1's tenure, CW1 oversaw issues related to the Company's inventory. In addition to contact during Company meetings, CW1 had frequent, almost daily contact with both CEO Goel and CFO Pantelick in CW1's early years at the Company, but less so subsequently.

38. According to CW1, PubMatic's management had long known about the Company's DSP problems before the Company's August 11, 2025 press release announcing its financial results for the fiscal quarter ended June 30, 2025. Specifically, CW1 stated that the Company "spent almost all of 2024 changing the way we did actions, trying to figure out how to get revenue from DSPs to stop leaking." CW1 stated that the Company's management understood that DSPs were moving inventory away from PubMatic, and that the Company was "in talks" with The Trade Desk about its behavior. CW1 stated that during these talks, The Trade Desk informed PubMatic that the Company was "being de-prioritized."

39. CW1 also indicated that in 2024, The Trade Desk informed PubMatic that it was creating "direct integrations" that would lessen the demand for PubMatic's product. CW1 stated that PubMatic and The Trade Desk engaged in "a lot of conversations" about the fact that The Trade Desk informed PubMatic that the Company was being de-prioritized. During meetings that involved these conversations, CW1 stated that The Trade Desk informed PubMatic that the Company's quality of inventory was not as good as Magnite (one of PubMatic's competitors), and that PubMatic was not as good in over-the-top video/connected TV ("OTT/CTV"). CW1 also said that projects were being heavily moved into CTV where budgets were becoming commoditized, and that The Trade Desk had informed PubMatic that it would be favoring Magnite, PubMatic's competitor, in this area. CW1 stated that The Trade Desk started changing how it optimized auctions well before it launched OpenPass. OpenPass, a product that created direct connections with publishers, thus circumventing supply-side platforms ("SSPs"), was soft launched in the second half of 2023, and in early 2024, the platform began adding features to drive wider adoption. According to CW1, OpenPass just made it official that The Trade Desk was trying to eliminate PubMatic as an SSP.

40. Additionally, CW1 stated that the Company's DSP problems were discussed in global meetings, which originally occurred weekly on Mondays and subsequently occurred monthly. CW1 stated that these global meetings were attended by CEO Goel as well as the Company's Vice President of Product Management. CW1 also stated that most executives involved with PubMatic's revenue participated in the Company's global meeting, including Chief Revenue Officer Kyle Dozeman and Executive Vice President of Product Nichant Khathri (who was focused on revenue optimization and, to that end according to CW1, was always working to update the back end of the Company's systems). CW1 stated that in 2024, PubMatic saw a big impact on monetization because of the Company's problems with DSPs and that it "was clear" that PubMatic

was not growing as fast as it had in previous years. According to CW1, these issues were discussed during the Company's weekly global meetings, which were attended by CEO Goel.

41. CW1 stated further that PubMatic's problems with DSPs were also discussed in weekly product management meetings, which were held on Wednesdays. According to CW1, CEO Goel also attended the Company's weekly product management meetings in addition to PubMatic's global meetings. CW1 indicated that "going back to 2024," there were huge projects around the reprioritization of traffic to The Trade Desk. CW1 described that in digital advertising, typically the technology involved will favor making money at any cost. However, according to CW1, to address the leakage of revenue related to The Trade Desk, PubMatic optimized things in favor of The Trade Desk to the point that the Company was "giving away money" to The Trade Desk. CW1 stated that it was clear that PubMatic was "in a lot of danger" because of the Company's problems with DSPs. According to CW1, former Vice President of Publisher Partnerships Janes, Amit Jamdade (the former Senior Director of Customer Success), and CW1 frequently voiced concerns during these meetings regarding these issues. CW1 stated that Janes, in particular, was "very vocal" during these meetings in stating that the Company's publishing demand was decreasing and that PubMatic faced serious challenges related to revenue as a result.

42. Furthermore, CW1 stated that internal Company documents demonstrate that Defendants were aware of, and had access to, information demonstrating the adverse effects that the Company's problems with DSPs were having upon PubMatic's financial results. According to CW1, PubMatic's minutes for the global meetings will reflect discussions related to PubMatic's problems with DSPs in general and with The Trade Desk in particular. CW1 also stated that minutes of the Company's weekly product management meetings will further document these problems and issues with respect to areas focused on monetization. CW1 indicated further that internal revenue

reports will reflect a decrease in the Company's revenue from DSPs, which Defendants tracked daily. According to CW1, "the warning signs were there."

43. Additionally, CW1 stated that during CW1's tenure, PubMatic's public statements "did not always match what was being discussed internally." For example, CW1 stated that the Company's management would claim that it was surprised by the effects a DSP would have upon PubMatic's financial results when internally the Company's executives previously discussed the same issues during the Company's global meetings and weekly product management meetings.

44. In addition to the other facts alleged herein, the core operations inference, among other things, demonstrates that Defendants made their misrepresentations and half-truths with scienter. Indeed, PubMatic indicated in various SEC filings that "[t]wo of our largest DSP relationships are with Google and The Trade Desk" and that "The Trade Desk and Google DV360 in particular – account for a significant portion of the ad impressions purchased on our platform." The Company also stated that "[w]e generate revenue from the use of our platform for the purchase and sale of digital advertising inventory" and that "[o]ur revenue and results of operations are highly dependent on the overall demand for advertising."

**<u>The Truth Begins to Emerge</u>**

45. On August 11, 2025, after the market closed, PubMatic issued a press release announcing its financial results for the fiscal quarter ended June 30, 2025. The press release quoted the Company's CFO, Defendant Pantelick, stating as follows, in relevant part:

> While our ***outlook includes a reduction in ad spend from one of our top DSP partners,*** the underlying health of the business remains strong while we mitigate the impact. Additionally, we are optimizing resources to focus on key priorities that include: diversifying DSP mix and accelerating investment on the buy-side, growing CTV, scaling emerging revenue streams, and integrating AI across our tech stack and operations. We have a healthy balance sheet and generate positive cash flow and are confident in the long-term strategy to drive durable, accelerated growth, increased profitability, and maximized shareholder value.

46. The Company held an earnings call the same day to discuss the quarterly results (the "2Q25 Earnings Call"). During the 2Q25 Earnings Call, CEO Goel, revealed that a "top DSP buyer" had "recently shifted a significant number of clients to a new platform that evaluates inventory differently" causing significant headwinds. In response to the inventory valuation change, CEO Goel stated the Company would "need to do a better job . . . to prioritize across all the hundreds of billions of daily ad impressions that we have, which subset of those impressions that we send to this DSP." Specifically, Goel stated as follows, in relevant part:

> So beginning in July, we saw a headwind emerge from a top DSP buyer, which recently shifted a significant number of clients to a new platform that evaluates inventory differently. And so the parameters of how they value inventory have changed, and we are working to optimize the inventory that we send this DSP accordingly. In addition, for some of our SPO partners, they did not realize until after the changes were made that their SPO strategies were no longer implemented. And so as a result, they need to reimplement their SPO settings on this DSP's new platform, and that process takes time. So accordingly, we saw this notable drop in spend in July, and then we've seen that stabilize in August.
>
> Now given the scale and complexity of our real-time platform, we anticipate that it will take several months to iterate and optimize the traffic that we send to this DSP. And so while we're doing this, a top priority for us is to accelerate the diversification of ad spend on our platform away from legacy DSPs. And we've been making progress, but we plan to accelerate our strategy. So for instance, in Q2, we expanded the share of spending from DSPs outside of the top 5 with performance marketers and mid-tier DSPs growing 20% year- over-year, such as MNTN and tvScientific and some China-based DSPs. In July, that same cohort accelerated to over 30% year-over- year.
>
> * * *
>
> No, I don't think it had anything to do with the auction dynamics, rather it's how they value inventory has changed. And so we need to do a better job, a different job to prioritize across all the hundreds of billions of daily ad impressions that we have, which subset of those impressions that we send to this DSP.

47. Further, during the 2Q25 Earnings Call, an analyst noted "***I think the platform shift that you're talking about has been going on for some time***" and asked if this change was the result of "large number of your SPO customers finally making that transition or something else?" In response, Defendant Goel stated as follows, in relevant part:

> So I mean we certainly saw an uptick or significant increase of this activity from the DSP causing the drop in spend in July. So I can't speak to exactly kind of what was their timeline or all the history of changes that they made. But that's what we

> observed on our platform, which we are -- again, we've stabilized, but are working to improve. So there are things that we need to do to shape the traffic accordingly from our platform more to the liking of that DSP. And so we're heavily engaged in that process.

48. On this news, PubMatic's stock price fell $2.23, or 21.1%, to close at $8.34 per share on August 12, 2025, on unusually heavy trading volume.

**Post Class Period Events**

49. On August 13, 2025, Investing.com published an article entitled "PubMatic's SWOT analysis; adtech firm navigates DSP headwinds amid CTV growth." The article stated in relevant part the following:

> PubMatic, Inc. (NASDAQ:PUBM), a leading digital advertising technology company with a market capitalization of $389 million, finds itself at a crucial juncture as it navigates through industry challenges while capitalizing on emerging opportunities. According to InvestingPro data, the company's stock has experienced significant volatility, declining over 47% in the past six months, while maintaining a strong balance sheet with more cash than debt. The company's recent performance and strategic initiatives paint a complex picture of resilience and adaptation in the face of evolving market dynamics.
>
> Financial Performance and Recent Developments
>
> PubMatic's second quarter of 2025 results revealed a mixed bag of outcomes. The company generated revenue of $292.2 million over the last twelve months, with an EBITDA of $21.1 million. While maintaining a healthy gross profit margin of nearly 65%, the company surpassed revenue and EBITDA expectations based on the high-end of its guidance. However, a new headwind emerged from a major Demand-Side Platform (DSP) partner, suspected to be The Trade Desk (NASDAQ:TTD), due to a platform change from Solimar to Kokai. This change affected how inventory is valued and led to a decline in year-over-year spend in July after experiencing double-digit growth in June.
>
> The impact of this DSP partner change has been significant enough for PubMatic to adjust its future revenue and EBITDA guidance. Management is actively working on optimizing inventory for this DSP partner, but the process is expected to take several months, creating uncertainty in the short term.
>
> Despite these challenges, PubMatic has shown strength in other areas. The company's Connected TV (CTV) revenue demonstrated significant year-over-year growth, now accounting for nearly 20% of total revenue. This shift towards faster-growing ad formats is a key part of PubMatic's strategy to diversify its revenue streams and reduce reliance on traditional display advertising, which tends to be more sensitive to macroeconomic factors.
>
> Revenue Streams and Growth Drivers
>
> PubMatic's efforts to diversify its revenue mix are bearing fruit. Emerging revenue streams, including the company's Connect and Activate platforms, more than

doubled year-over-year. These new offerings are becoming increasingly important as PubMatic seeks to reduce its dependence on its top two DSP partners.

The company's focus on Supply Path Optimization (SPO) has also shown positive results, with increased activity indicating higher retention of ad spend on the platform. This trend is particularly important as it suggests that advertisers and agencies are finding value in PubMatic's offerings and are willing to consolidate their spending through the platform.

PubMatic's expansion in the CTV space is particularly noteworthy. The doubling of CTV revenue year-over-year and its growing share of total revenue demonstrate the company's ability to capitalize on the shift towards streaming and digital TV advertising. Partnerships with entities such as MNTN, tvScientific, FanServ, MLB, Fubo TV, DirecTV, Spectrum, and Roku (NASDAQ:ROKU) are likely contributing to this growth.

Challenges and Headwinds

The most pressing challenge for PubMatic is the recent headwind from a major DSP partner. This situation has created a lack of visibility in PubMatic's business and is expected to impact revenue in the coming quarters. The time required to optimize inventory for the new DSP platform adds an element of uncertainty to the company's short-term outlook.

Macroeconomic uncertainties also loom large over the digital advertising industry as a whole. While PubMatic reported stable demand at the beginning of the year, there is caution around the second half of 2025 due to broader economic concerns. The company's display advertising segment, in particular, may be more vulnerable to these macroeconomic factors.

50. On August 18, 2025, CEO Goel and CFO Panelick participated in the Rosenblatts Fifth Annual Technology Summit – The Age of AI (Part II). During the summit, Defendants stated the following:

**Q - Barton Crockett**
Okay. Now I want to pause for a minute. So for everyone listening, there is an opportunity to put questions into the conversation, if you access your chat functionality, I'll see the questions on my screen and I can work them in to the discussion. So moving ahead, I want to talk for a minute about the second quarter earnings report. So your earnings report post-close on August 11. The results were better than guided, the headline results. Your sales were up 6% actual or 19% core. And -- but there was this third quarter guidance that brought out an issue with a reset at a major DSP partner, where after 19% core growth, you were looking at down 8% to 15% in the third quarter, maybe a portion of that was political headwinds, 7 percentage points. But still, the big growth core was being impacted by a DSP partner that was resetting. And I was wondering if you could talk about what's happening with that partner. And any thoughts about how long this continues to be a headwind? And why are you guys seeing this? And why haven't we heard about this from the other major publicly traded SSP out there, Magnite.

**A - Rajeev Goel**
Sure. Yes. So let me talk about the DSP impact, and then I can turn it over to Steve to get into some of the factors around our guidance. So beginning in July, as you

said, we called out that we saw a headwind emerge from a top DSP buyer, which recently shifted a significant number of its clients to a new platform, and that platform evaluates inventory differently than its old platform. And so one of the features of an SSP is that we are doing what's called trac shaping, which has processed about 900 billion daily ad impressions. We do not send all of those ad impressions to every DSP because most DSPs can't handle that volume from us and other SSPs. And so we send a subset of that inventory to each DSP. And so we have to determine using machine learning algorithms which inventory is that DSP likely to bid on and which inventory to send.

And so the parameters of how they evaluate inventory have changed. And so we are working to optimize the inventory that we send this DSP. And we're working, of course, very hard on this, and we think it will take some time to play out. I would say some of the SPO partners that we work with advertisers and agencies were also surprised by the shift. So they did not realize until after the changes were made that their SPO strategies were no longer implemented in the DSP and so they had to go back in and work through that process to reimplement their SPO strategies. And so that is also taking some time. So we saw a notable drop in activity from this DSP in July, which has stabilized in August. And I think it's going to take us some time, given the scale and complexity of our platform to -- really to optimize the trac that we send to this DSP.

So while we are doing this, I think a top priority for us is to also accelerate the diversification of ad spend on our platform away from legacy DSPs. So we've been making progress, but we plan to accelerate our strategy. And I think that strategy will also play out over time, but ultimately lead to significant benefits. So in Q2, we expanded the share of spending from DSPs outside of the top five with performance marketers and mid-tier DSPs growing 20% plus year-over-year. So some of the names that we talked about earlier, Mountain, tvScientic, some China-based DSPs.

Another great example is Amazon, which is a significant relationship for us, both as an inventory provider, as well as a DSP buyer. So we've been scaling very nicely with them in June and July, for instance, our Amazon revenues grew very healthy double digits. So our focus is really on expanding that cohort where we think ad budgets are growing faster and where we can not only grow our business but also diversify as it's clear that the concentration of our legacy DSP relationships is a significant factor constraining our growth, and we intend to address that head on.

**A - Steve Pantelick**
Sure. Now with respect to our outlook, we shared a range, $61 million to $66 million, in terms of Q3. And the way that we form the lower end of the ranges, take a look at the latest data we had from July. And as Rajeev pointed out, the spend trends from the DSP that we saw in July stabilized. So the low end of the range assumes that stabilization is about where it is today, meaning it's flattish through the end of the quarter. And we also saw a little bit of softness in terms of a couple of consumer discretionary verticals. So we were being prudent in terms of coming up with a range, probably broader than we would normally. And I think the way to think about how we're working through it is a couple of things. One, Rajeev commented on all the things we're doing to influence the trajectory on the DSP affected. We also, as a reminder to those who are not familiar with PubMatic, we have a very diverse set of ad verticals, over 20-plus ad verticals, and they're pretty well proportioned across those ad verticals. And we saw a strength in a number of those in the second quarter and in July. There was some of that softness. But I think for the consumer's discretionary, but it absolutely wasn't, I'll call sort of a notable decline. So it's something that we're paying attention to. So to the extent to which we are able to

> continue to make efforts, progress against the DSP impact. We would be approaching the upper end of the range. And if there is no, I'd call, continuing macro effect, that's materially negative, then I think we're going to be at the upper end. So we got puts and takes. From my perspective, when you step back, we built a business over the long run to focus on the secular growth areas. And those are doing quite well. Rajeev shared some of that data, but it's really worth underscoring. Today, over 40% of our business is a high-value video, the foundation of that is CTV, which growing over 50%. And that was -- this past quarter was the sixth straight quarter, which we did that. Our emerging revenue is doubling. So we feel, as a business, we're putting our wood behind the greatest opportunities and where we can double downing on making those grow even faster. And so we're going through an optimization eort in terms of making sure we have all of our resources in the right area. And to execute against the game plan that Rajeev described, diversifying our DSPs, putting more effort and focus on the fastest-growing areas and then ultimately continue to innovate. We've been very successful in incorporating AI initiatives a couple of years ago in the back end in terms of engineering, and that now has come into the front into the product portfolio, which we think will have long-term gains for us as a business. So we think as a business, we're quite healthy, and we're going to work through -- we're confident we're going to work through this DSP impact.

51. On November 11, 2025, AdExchanger published an article entitled "How PubMatic Countered A Big DSP's Spending Dip In Q3 (And Our Theory On Who It Was)." In the article, AdExchanger stated the following:

> You know those stock images that show two businesspeople in suits shaking hands, but one is hiding a knife behind their back?
>
> Well, it would be a more accurate portrayal of the current DSP/SSP dynamic if both figures were holding knives.
>
> During PubMatic's Q3 earnings call on Monday, several investors pressed the company's leadership about The Trade Desk's new penchant for referring to supply-side platforms as "resellers" and whether PubMatic is seeing any impact from TTD's push to go direct to publishers.
>
> Rajeev Goel, PubMatic's CEO and co-founder, demurred like a champ.
>
> He dismissed the "reseller" label as "noise" and pointed to PubMatic's recent collaboration with The Trade Desk on an API that helps publishers and advertisers share deal metadata between platforms in real time.
>
> "PubMatic is a platform for direct inventory monetization – reselling is not our business," Goel said. "We are a direct connection to publishers … and I think it's pretty clear we provide value in ways that DSPs do not."
>
> Buyers, Activate!
>
> One way PubMatic says it provides value is through yield optimization.
>
> TTD, in particular, "has been very clear that they're not in the yield optimization business," Goel said, "and so a publisher needs to have a yield function in place in order to maximize their revenue, which is core to what we do."

By the same token, PubMatic isn't sticking strictly to its traditional lane either. It's been striking more direct deals with midtier DSPs and buyers, much like how The Trade Desk has been connecting directly with publishers through OpenPath.

Specifically, PubMatic has been onboarding more buyers onto Activate, its direct-to-supply buying platform. During the first nine months of the year, the number of its customers using Activate grew by 35%, and the number of Activate campaigns on the platform increased more than 4x year over year.

"We think there's a lot of benefit from vertical integration," Goel said, acknowledging, in answer to an investor's question, that this "is somewhat akin to what the walled gardens do."

Summer squeeze

***Despite what looks like all the right strategic moves, industry tensions can still take concrete shape, such as when one of PubMatic's largest DSP partners scaled back spending over the summer, putting pressure on quarterly numbers.***

***In July, PubMatic said it experienced a sudden drop in ad spend from a "large" and unnamed DSP partner, a shift that dragged down overall revenue in Q3, which clocked in at $68 million, a 5% year-over-year decline.***

***According to PubMatic CFO Steve Pantelick, "spend stabilized from this DSP in August and September, resulting in a lower but steady run rate."***

This dip is unrelated to PubMatic's $5 million revenue shortfall last year, which was caused by Google DV360's switch to a fully first-price auction in mid-2024. On Monday, Pantelick told investors the company is managing through the impact by focusing on growth in CTV, apps and other "emerging revenue streams."

The curious case of the disappearing DSP dollars

***But who the heck is this mysterious DSP partner?***

***Neither Goel nor Pantelick identified the company by name during the call, referring to it only as a "large DSP partner" or simply "this DSP."***

***But there was one big clue.***

***At one point, in response to an investor query about the impact that OpenPath and Kokai, The Trade Desk's new buying platform, are having on PubMatic's business, Goel acknowledged that Kokai evaluates and buys media "differently from what we have seen."***

***He then described several moves PubMatic recently made to adapt to Kokai, including revising its machine learning algorithms to "ensure we're sending an optimal mix of inventory to them" and working closely with supply-path optimization partners and agencies to help them reconfigure their settings in the DSP.***

***When talking about Kokai, these are the exact words Goel used: "We took two important steps over the course of Q3 resulting in spend stabilizing in August and September, as Steve mentioned."***

***In other words, the mystery isn't much of a mystery if you read between the lines.***

So, case closed?

## CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's securities during the Class Period, and who were damaged thereby ("Class"). Excluded from the Class are: (a) persons and entities that suffered no compensable losses; and (b)(i) Defendants; (ii) any person who served as a partner, control person, officer, and/or director of the Company during the Class Period, and members of their immediate families; (iii) present and former parents, subsidiaries, assigns, successors, affiliates, and predecessors of the Company; (iv) any entity in which the Defendants have or had a controlling interest; (v) any trust of which an Individual Defendant is the settler or which is for the benefit of an Individual Defendant and/or member(s) of their immediate families; (vi) Defendants' liability insurance carriers; and (vii) the legal representatives, heirs, successors, and assigns of any person or entity excluded under provisions (i) through (vi) hereof.

53. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

55. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

56. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts constituted violations of the federal securities laws;

(b) whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c) whether the price of the Company's securities was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

57. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION**

58. During the Class Period, as detailed herein, Defendants engaged in a scheme to

deceive the market and a course of conduct that artificially inflated the price of the Company's securities. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly as the prior artificial inflation dissipated from the Company's securities.

59. As a direct result of Defendants' misstatements and omissions alleged herein, the price of the Company's securities was higher than it would have been but for Defendants' misrepresentations and half-truths. Specifically, Defendants' misstatements and half-truths increased the price of the Company's securities, maintained the price, and/or prevented a greater decrease in the price.

60. As a result of the purchases of the Company's securities during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.

61. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly. These declines removed the inflation from the price of the Company's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

62. The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's securities negate any inference that the loss suffered by Plaintiff

and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

63. The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

64. At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a) The Company's securities met the requirements for listing, and were listed and actively traded on the NASDAQ exchange, a highly efficient, electronic stock market;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC and the NASDAQ exchange;

(c) The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

65. As a result of the foregoing, the market for the Company's securities promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Under these circumstances,

all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

66. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

67. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

68. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading. These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69. To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

70. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

71. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Plaintiff and the Class would not have purchased the Company's securities at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

72. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

73. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

74. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company,

including the content and dissemination of the various statements alleged to be false and misleading herein.

75. The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

76. The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

77. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: February 9, 2026

**GLANCY PRONGAY WOLKE & ROTTER LLP**

By: *s/ Ex Kano S. Sams II*

Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

*Counsel for Lead Plaintiff Sidney Hsu and for the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On February 9, 2026, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 9, 2026.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II