United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIDNEY HSU,<br>Plaintiff,<br>v.<br>PUBMATIC, INC., RAJEEV K. GOEL, and STEVEN PANTELICK,<br>Defendants. | Case No. 25-cv-07067-JSC<br>**ORDER RE: MOTION TO DISMISS**<br>Re: Dkt. No. 39 |

Plaintiff brings this putative class action against PubMatic, Inc. ("PubMatic") and its Chief Executive Officer Rajeev K. Goel and Chief Financial Officer Steven Pantelick ("Individual Defendants") for making false and misleading statements. (Dkt. No. 38.)[1] Pending before the Court is Defendants' motion to dismiss. (Dkt. No. 39.) Having considered the parties' submissions, the Court concludes oral argument is not required, *see* N.D. Cal. Civ. L.R. 7-1(b), VACATES the July 31, 2026 oral argument, and GRANTS Defendants' motion to dismiss. Plaintiff's complaint does not adequately identify the challenged statements or allege facts that support an inference as to why each challenged statement is false or misleading, and Plaintiff does not allege facts which create a strong inference of Defendants' scienter.

## BACKGROUND

### I. AMENDED COMPLAINT ALLEGATIONS

"PubMatic is a technology company that enables real time programmatic advertising transactions for advertisers, agencies, and demand side platforms ('DSPs')." (Dkt. No. 38 ¶ 2.) According to PubMatic, "its integrated technology platform empowers content creators (which it

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

refers to as 'publishers') across the Internet to maximize monetization of their advertising inventory" and "provides control and technology to buyers, which includes advertisers, agencies, agency trading desks, and DSPs." (*Id.* ¶ 25.)

On August 11, 2025, PubMatic issued a press release announcing its financial results for the fiscal quarter ended June 30, 2025, in which Mr. Pantelick stated PubMatic's "outlook includes a reduction in ad spend from one of [its] top DSP partners." (*Id.* ¶ 45.) In an earnings call that day, Mr. Goel revealed "beginning in July, we saw a headwind emerge from a top DSP buyer, which recently shifted a significant number of clients to a new platform that evaluates inventory differently." (*Id.* ¶ 46.) According to Mr. Goel, PubMatic "saw this notable drop in spend in July, and then [] s[aw] that stabilize in August." (*Id.*) When asked whether "the platform shift that [he was] talking about has been going on for some time," Mr. Goel responded he could not "speak to exactly what was their timeline or all the history of changes that they made," but PubMatic "certainly saw an uptick or significant increase of this activity from the DSP causing the drop in spend in July." (*Id.* ¶ 47.)

"On this news, PubMatic's stock price fell $2.23, or 21.1%, to close at $8.34 per share on August 12, 2025." (*Id.* ¶ 48.)

**A. False Statements and Misrepresentations**

In (1) a February 27, 2025 press release announcing financial results for the fiscal quarter and full year ended December 31, 2024, (*id.* ¶ 29); (2) a February 27, 2025 SEC Form 10-K for Fiscal Year 2024, (*id.* ¶¶ 30-32); (3) a May 8, 2025 press release regarding financial results for the fiscal quarter ending March 31, 2025, (*id.* ¶ 33); and (4) its May 8, 2025 SEC Form 10-Q disclosing financial results for the fiscal quarter ending March 31, 2025, (*id.* ¶¶ 34-35), PubMatic made "materially false and misleading" statements which "failed to disclose material adverse facts about the Company's business, operations, and prospects." (*Id.* ¶ 36.) "Specifically, Defendants failed to disclose to investors: (1) that a top DSP buyer was shifting a significant number of clients to a new platform which evaluated inventory differently; (2) that, as a result, PubMatic was seeing a reduction in ad spend and revenue from this top DSP buyer; and (3) that, as a result of the foregoing, Defendants' positive statements about [PubMatic's] business, operations, and prospects

United States District Court
Northern District of California

were materially misleading and/or lacked a reasonable basis." (*Id.* ¶ 36.)

The Complaint bolds and italicizes several specific statements, including:

(1) **February 27, 2025 press release**:

> Revenue growth in the year more than doubled over 2023, driven by strength in CTV, emerging revenue streams, and marquee customers choosing PubMatic to build and scale their ad business. (*Id.* ¶ 29.)

(2) **SEC Form 10-K for Fiscal Year 2024**:

> Our disclosure controls and procedures were effective at a reasonable assurance level. (*Id.* ¶ 30)

> Our software platform could be susceptible to errors, defects, or unintended performance problems that could adversely affect our business, results of operations, and financial condition. . . . Our continued business success depends on our ability to offer high-quality inventory with appropriate viewability capabilities. (*Id.* ¶ 31.)

> Our revenue and results of operations are highly dependent on the overall demand for advertising. . . . Reductions in overall advertising spending due to these factors could make it difficult to predict our revenue and could adversely affect our business, results of operations, and financial condition. If our existing customers do not expand their usage of our platform, or if we fail to attract new publishers and buyers, our growth will suffer. Moreover, any decrease in the use of the advertising channels that we primarily depend on, or failure to expand into emerging channels, could adversely affect our business, results of operations, and financial condition. . . . A relatively small number of premium publishers have historically accounted for a significant portion of the ad impressions sold on our platform, as well as a significant portion of our revenue from publishers, including a relatively small number of channel partners. . . . As a result, the amount, quality, and cost of ad impressions available to us can change at any time with little or no prior notice, and we cannot assure you that we will have access to a consistent volume or quality of ad impressions at a reasonable cost, or at all. We depend upon a relatively small number of premium publishers and channel partners and expect to continue to do so for the foreseeable future. To support our continued growth, we seek to add additional publishers and buyers to our platform and to expand current utilization with our existing publishers and buyers. Any disruptions in our relationships with premium publishers, buyers, or our largest channel partners could adversely affect our business, results of operations, and financial condition. If we cannot retain or add individual publishers with valuable ad impressions, or if such publishers decide not to make their valuable ad impressions available to us, then our buyers may be less inclined to use our platform, which could adversely affect our business, results of operations, and financial condition. A limited number of large demand side platforms ("DSPs") – The Trade Desk and Google DV360 in particular – account for a significant portion of the ad impressions purchased on our platform. . . . We have no minimum commitments from buyers to spend on our platform, so the

> amount of demand available to us can change at any time with little or no prior notice, and we cannot assure you that we will have access to a consistent volume or quality of ad campaigns or demand for our ad impressions at a reasonable price, or at all. Any disruptions in our relationships with DSPs, agencies, advertisers, or buyers could adversely affect our business, results of operations, and financial condition. If a buyer or group of buyers representing a significant portion of the demand in our marketplace decides to materially reduce use of our platform, it could cause an immediate and significant decline in our revenue and profitability and adversely affect our business, results of operations, and financial condition. In addition, our business results, including revenues, may be impacted by changes in their pricing strategies, bidding algorithms, or go-to-market efforts. . . . We may not be able to accurately predict changes in overall advertiser demand for the channels in which we operate and cannot assure you that our investment in formats will correspond to any such changes or shifts in demand. Any decrease in the use of mobile, display, and video advertising, whether due to customers losing confidence in the value or effectiveness of such channels, regulatory restrictions or other causes, or any inability to further penetrate CTV or enter new and emerging advertising channels, could adversely affect our business, results of operations, and financial condition. (*Id.* ¶ 32.)

(4) **SEC Form 10-Q for Quarter Ending March 31, 2025**:

> Our disclosure controls and procedures were effective at a reasonable assurance level. (*Id.* ¶ 34.)

> Our revenue and results of operations are highly dependent on the overall demand for advertising. . . . Reductions in overall advertising spending due to these factors or other factors could make it difficult to predict our revenue and could adversely affect our business, results of operations, and financial condition. (*Id.* ¶ 35.)

**B. Defendants' Prior Knowledge**

According to a PubMatic confidential witness ("CW1"), "PubMatic's management had long known about [PubMatic's] DSP problems before the Company's August 11, 2025 press release." (*Id.* ¶ 38.) CW1 worked as Director of Global Support from August 2019 to June 2020, and as Senior Director of Customer Enablement from August 2019 to April 2025, in which role they "managed [PubMatic's] platform capacity[,] oversaw the way PubMatic allocated space to publishers," and "oversaw issues related to [PubMatic's] inventory." (*Id.* ¶ 37.) CW1 reported to Jaan James, PubMatic's former Vice President of Publisher Partnerships, and in their early years at [PubMatic], but less so subsequently," "had frequent, almost daily contact" with Mr. Goel and Mr. Pantelick. (*Id.*)

CW1 stated PubMatic "'spent almost all of 2024 changing the way [it] did actions, [and]



United States District Court
Northern District of California

trying to figure out how to get revenue from DSPs to stop leaking.'" (*Id.* ¶ 38.) According to CW1, PubMatic's "management understood that DSPs were moving inventory away from PubMatic" and was "'in talks' with The Trade Desk [("TTD")] about its behavior," during which talks TTD "informed PubMatic that [it] was 'being de-prioritized.'" (*Id.*) TTD also informed PubMatic "it was creating 'direct integrations' that would lessen the demand for PubMatic's product," and PubMatic's "quality of inventory was not as good as Magnite (one of PubMatic's competitors)," so TTD "would be favoring Magnite, PubMatic's competitor, in" connected TV. (*Id.* ¶ 39.)

According to CW1, PubMatic's "DSP problems were discussed in global meetings," which Mr. Goel, as well as "most executives involved with PubMatic's revenue participated in." (*Id.* ¶ 40.) In these global meetings, the attendees discussed "a big impact on monetization because of [PubMatic's] problems with DSPs," and "it 'was clear' that PubMatic was not growing as fast as it had in previous years." (*Id.*)

"PubMatic's problems with DSPs were also discussed in weekly product management meetings," which Mr. Goel also attended. (*Id.* ¶ 41.) "CW1 indicated that 'going back to 2024,' there were huge projects around the reprioritization of traffic to [TTD]," in an attempt to "address the leakage of revenue related to [TTD]." (*Id.*) According to CW1, "it was clear that PubMatic was 'in a lot of danger' because of the Company's problems with DSPs." (*Id.*) CW1 and Mr. Janes "frequently voiced concerns during these meetings regarding these issues," and Mr. Janes, "in particular, was 'very vocal' during these meetings in stating that [PubMatic's] publishing demand was decreasing and that PubMatic faced serious challenges related to revenue as a result." (*Id.*)

According to CW1, PubMatic's global meeting minutes "will reflect discussions related to PubMatic's problems with DSPs in general and with [TTD] in particular," minutes of the weekly product management meetings "will further document these problems and issues with respect to areas focused on monetization," and "internal revenue reports will reflect a decrease in [PubMatic's] revenue from DSPs." (*Id.* ¶ 42.) "CW1 also stated [PubMatic's] management would [publicly] claim that it was surprised by the effects a DSP would have upon PubMatic's

financial results when internally [PubMatic's] executives previously discussed the same issues during the [] global meetings and weekly product management meetings." (*Id.* ¶ 43.)

"In addition to the other facts alleged herein, the core operations inference, among other things, demonstrates that Defendants made their misrepresentations and half-truths with scienter." (*Id.* ¶ 44.) In SEC filings, PubMatic stated "[t]wo of our largest DSP relationships are with Google and [TTD]," "[TTD] and Google DV360 . . . account for a significant portion of the ad impressions purchased on our platform," "[w]e generate revenue from the use of our platform for the purchase and sale of digital advertising inventory," and "[o]ur revenue and results of operations are highly dependent on the overall demand for advertising." (*Id.*)

## II. PROCEDURAL HISTORY

After Plaintiff sued Defendants and issued notice, (Dkt. Nos. 1, 6), the court appointed Plaintiff as lead plaintiff, (Dkt. No. 31), and related Case Nos. 25-cv-07224, 25-cv-07391, and 25-cv-07618, (Dkt. No. 33). Plaintiff then filed an amended complaint on behalf of all persons and entities who purchased PubMatic securities between February 27, 2025 and August 11, 2025, alleging: (1) all Defendants violated Exchange Act section 10(b) and SEC Rule 10b-5, and (2) Individual Defendants violated Exchange Act section 20(a). (Dkt. No. 38.) Defendants now move to dismiss Plaintiff's amended complaint. (Dkt. No. 39.)

# DISCUSSION

## I. REQUEST FOR INCORPORATION BY REFERENCE AND JUDICIAL NOTICE

Defendants ask the Court to consider eight exhibits in ruling on their motion to dismiss. (Dkt. No. 41.) While district courts generally "may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)," the incorporation-by-reference doctrine and judicial notice are two exceptions to this rule. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

Rather than contest the authenticity of—or otherwise object to—any particular document, Plaintiff opposes Defendants' request because Defendants seek judicial notice and incorporation by reference for improper reasons, namely, "for the truth of the matter asserted within the documents," to "negate Plaintiff's scienter allegations," and "to contradict conclusory allegations."

United States District Court
Northern District of California

(Dkt. No. 43 at 5.) Although Plaintiff correctly notes there are limits to ***how*** the Court should consider the contents of documents incorporated by reference or judicially noticed, Plaintiff's arguments do not affect ***whether*** the Court can consider Defendants' proposed documents. *See Khoja*, 899 F.3d at 1003 ("[While] a court may assume an incorporated document's contents are true for purposes of a motion to dismiss, . . . it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint" (cleaned up)); *see also id.* at 999 ("[A] court cannot take judicial notice of disputed facts contained in [] public records." (citation omitted)).

**A. Incorporation by Reference**

While "mere mention of the existence of a document is insufficient to incorporate the contents of a document, the document is incorporated when its contents are described and the document is integral to the complaint." *Tunac v. United States*, 897 F.3d 1197, 1207 n.8 (9th Cir. 2018) (cleaned up). Both conditions are satisfied for the documents Defendants present. (Dkt. No. 40-1 (PubMatic's 2024 Form 10K, described at Dkt. No. 38 ¶¶ 30-32); Dkt. No. 40-2 (PubMatic's Feb. 27, 2025 press release, "PubMatic Announces Fourth Quarter and Fiscal Year Ended 2024 Financial Results," described at Dkt. No. 38 ¶ 29); Dkt. No. 40-3 (PubMatic's May 8, 2025 press release, "PubMatic Announces First Quarter 2025 Financial Results; Board of Directors Authorizes $100M Expansion of Share Repurchase Program," described at Dkt. No. 38 ¶ 33); Dkt. No. 40-4 (PubMatic's Form 10-Q for quarter ending March 31, 2025, described at Dkt. No. 38 ¶¶ 34-35); Dkt. No. 40-5 (PubMatic's Aug. 11, 2025 press release, described at Dkt. No. 38 ¶ 45); Dkt. No. 40-6 (Transcript of PubMatic's Aug. 11, 2025 earnings call, described at Dkt. No. 38 ¶¶ 46-47); Dkt. No. 40-7 (Aug. 13, 2025 Investing.com article "PubMatic's SWOT analysis; adtech firm navigates DSP headwinds amid CTV growth," described at Dkt. No. 38 ¶ 49); Dkt. No. 40-8 (Transcript from Aug. 18, 2025 Rosenblatt Fifth Annual Technology Summit, described at Dkt. No. 38 ¶ 50.) The Court therefore incorporates these documents by reference.

**B. Judicial Notice**

"Judicial notice . . . permits courts to notice an adjudicative fact if it is 'not subject to reasonable dispute,'" meaning the fact is "'generally known', or 'can be accurately and readily

determined from sources whose accuracy cannot reasonably be questioned.'" *Khoja*, 899 F.3d at 999 (quoting Fed. R. Evid. 201). Because "[c]ourts routinely take judicial notice of SEC filings in securities cases where authenticity is not disputed," *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *6 (N.D. Cal. June 2, 2020) (citations omitted), the Court takes notice of PubMatic's SEC filings and press releases regarding those filings. (Dkt. Nos. 40-1, 40-2, 40-3, 40-4, 40-5.) Likewise, because "[publicly] accessible websites and news articles are proper subjects of judicial notice," *WeWork Companies Inc. v. WePlus (Shanghai) Tech. Co.*, No. 5:18-CV-04543-EJD, 2020 WL 83845, at *2 (N.D. Cal. Jan. 7, 2020) (cleaned up), the Court notices the August 13, 2025 Investing.com article. (Dkt. No. 40-7.) And because earnings call and conference transcripts are "matters of public record not subject to reasonable dispute," the Court also notices PubMatic's August 11, 2025 earnings call transcript and the August 19, 2025 Rosenblatt Virtual Technology Summit transcript. (Dkt. Nos. 40-6, 40-8.) *See Sneed v. AcelRx Pharms., Inc.*, No. 21-CV-04353-BLF, 2024 WL 2059121, at *4 (N.D. Cal. May 7, 2024) (citation omitted), *aff'd sub nom. Sneed v. Talphera, Inc.*, 147 F.4th 1123 (9th Cir. 2025).

## II. MOTION TO DISMISS

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security, . . . any manipulative or deceptive device or contrivance" in contravention of SEC regulations. *See* 15 U.S.C. § 78j(b). Under Rule 10b-5, promulgated under the authority of section 10(b), it is unlawful "[t]o make any untrue statement of fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *See* 17 C.F.R. § 240.10b–5(b). "To be viable, a claim brought under section 10(b) and Rule 10b–5 must contain six essential elements:

> (1) a material misrepresentation or omission by the defendant;
> (2) scienter;
> (3) a connection between the misrepresentation or omission and the purchase or sale of a security;
> (4) reliance upon the misrepresentation or omission;
> (5) economic loss; and
> (6) loss causation.

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d

1268, 1274 (9th Cir. 2017) (quotation marks and citation omitted).

Additionally, to survive a motion to dismiss, a Section 10(b) claim must satisfy three pleading standards. First are the general pleading requirements of Federal Rule of Procedure 8(a), mandating "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). Second, pursuant to Federal Rule of Civil Procedure 9(b), the complaint must "state with particularity the circumstances constituting fraud," *see* Fed. R. Civ. P. 9(b), in order "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *See Neubronner v. Milken*, 6 F.3d 666, 671 (9th Cir. 1993) (quotation marks and citation omitted). Third, the complaint must satisfy the requirements of the Private Securities Litigation Reform Act ("PSLRA"), which mandate "plead[ing] with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002) (quotation marks and citation omitted). To do so, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u-4(b)(1).)

**A. Material Misrepresentation or Omission**

Because Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," "[c]ourts may dismiss cases for 'puzzle pleading,' where the complaint 'recite[s] lengthy statements attributed to the defendants, followed by a generalized list of reasons that the statements may have been false or misleading or a generalized list of omissions that were required to make the statements not misleading.'" *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274 (N.D. Cal. 2019) (quoting *Tarapara v. K12 Inc.*, No. 16-CV-4069-PJH, 2017 WL 3727112, at *9 (N.D. Cal. Aug. 30, 2017)).

In addition, to plead falsity under the PSLRA, a plaintiff must plead "specific facts indicating why" each challenged statement was false or misleading. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (citation omitted). "For a statement to be false or misleading, it must directly contradict what the defendant knew at that

time or omit material information." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (cleaned up). "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Hewlett-Packard Co.*, 845 F.3d at 1275 (cleaned up). So, federal securities laws "do not create an affirmative duty to disclose any and all material information"; instead, "[d]isclosure is required . . . only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (holding Rule 10b-5 proscribes "half-truths, not pure omissions").

For more than eight pages of his complaint, Plaintiff quotes several paragraph-long excerpts from PubMatic's public filings, (Dkt. No. 38 ¶¶ 29-35), before alleging "[t]he statements above in ¶¶ 29-35 were materially false and misleading" because

> Defendants failed to disclose to investors: (1) that a top DSP buyer was shifting a significant number of clients to a new platform which evaluated inventory differently; (2) that, as a result, PubMatic was seeing a reduction in ad spend and revenue from this top DSP buyer; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

(*Id.* ¶ 36.) Plaintiff's complaint "renders it exceedingly difficult to discern precisely which statements are alleged to be misleading." *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001). For example, Plaintiff includes several of PubMatic's reported balance sheets, (Dkt. No. 38 ¶¶ 29, 33, 34), without alleging what information was omitted from those balance sheets to make them misleading. Plaintiff also bolds and italicizes certain sentences, such as "[o]ur disclosure controls and procedures were effective at a reasonable assurance level." (*Id.* ¶ 30.) However, Plaintiff's emphasis in his complaint does not align with the statements Plaintiff identifies as false and misleading in his opposition brief. (Dkt. No. 42 at 10-12.) And, when paired with Plaintiff's "generalized list of omissions that were required to make the statements not misleading," Plaintiff's bolding and italicizing of particular sentences is insufficient to show Plaintiff is entitled to relief. *See Align Tech., Inc.*, 417 F. Supp. 3d at 1274-75 (dismissing a plaintiff's complaint for "impermissible 'puzzle pleading'" when "under the heading 'Defendants' Materially False and Misleading Statements and Omissions,'" the plaintiff "quotes

and discusses paragraph-long statements and selectively bolds and italicizes certain sentences”). So, the Court dismisses Plaintiff’s claim for impermissible “puzzle pleading” in violation of Federal Rule of Civil Procedure 8(a)(2).

Because Plaintiff does not identify the challenged statements, Plaintiff also fails to plead “specific facts indicating why” each challenged statement is false or misleading. *See Metzler Inv. GMBH*, 540 F.3d at 1070. In his opposition brief, Plaintiff elaborates on which statements he challenges and why those statements are false or misleading. But in evaluating a motion to dismiss, the Court “is limited to analyzing the factual allegations in the complaint, and not those contained in . . . Plaintiff’s opposition to the motion to dismiss.” *Ewing v. Flora*, No. 14-CV-2925 AJB (NLS), 2015 WL 12564225, at *5 n.6 (S.D. Cal. Mar. 25, 2015) (citing *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990)). Furthermore, Plaintiff’s arguments why the challenged statements are false and misleading depend on CW1’s alleged statements. But, as explained below, the complaint’s allegations do not permit Plaintiff to rely on CW1’s statements to allege scienter; for the same reasons, Plaintiff cannot rely on CW1’s statements to allege falsity. *See Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1031 (N.D. Cal. 2020) (“If a plaintiff relies upon a CW to show the falsity of the statements alleged, the CW must be described with sufficient particularity to establish his reliability and personal knowledge, and the statements reported by the CW must be indicative of scienter.” (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)).

So, the Court dismisses Plaintiff’s complaint because he does not adequately plead Defendants’ material misrepresentation or omission under Federal Rule of Civil Procedure 8(a)(2) or the PSLRA.

**B. Scienter**

“To adequately plead scienter, a securities fraud complaint must ‘state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.’” *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). “A complaint can plead scienter by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness.”

*Id.* (citation omitted); *see also Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010) ("[T]he ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity.").

Courts first determine whether any "allegations, standing alone, are sufficient to create a strong inference of scienter." *Zucco*, 552 F.3d at 992. "[I]f no individual allegations are sufficient, [courts] will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* In reviewing the sufficiency of a complaint's allegations, the court must "take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007). "A complaint will survive. . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Additionally, when "plaintiffs seek to hold individuals and a company liable on a securities fraud theory," they must "allege scienter with respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (citation omitted). "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter." *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) (citing *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th Cir. 1995)).

**1. Confidential Witness**

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* (citations omitted); *see also id.* (explaining this prong "analyzes whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge."). "Second, these statements which are reported by confidential witnesses with sufficient reliability and personal knowledge

must themselves be indicative of scienter." *Id.* (citation omitted).

To allege Defendants' scienter, Plaintiff primarily relies on confidential witness CW1. By alleging CW1's job title and period of employment, (Dkt. No. 38 ¶ 37), Plaintiff sufficiently describes CW1's position at PubMatic. *See Zucco*, 552 F.3d at 996 (holding the complaint "describes the confidential witnesses' job titles and employment information with ample detail to satisfy [the] requirement that a complaint make apparent a confidential witness's position within the defendant corporation").

However, for several of CW1's statements, Plaintiff does not "allege with particularity facts supporting its assumptions that [CW1] w[as] in a position to be personally knowledgeable of the information alleged." *See id.* at 996; *see also Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1039 (N.D. Cal. 2012) (holding confidential witness statements unreliable given the questionable basis for the information of each of the witnesses"), *aff'd*, 561 F. App'x 598 (9th Cir. 2014). For example, Plaintiff's allegations PubMatic knew TTD was de-prioritizing PubMatic depend on statements made by TTD "in talks with" PubMatic's management. (Dkt. No. 38 ¶¶ 38-39.) However, Plaintiff does not allege CW1 was present for those talks or otherwise allege a basis for CW1's personal knowledge. Similarly, Plaintiff alleges Mr. Goel knew about PubMatic's "DSP problems" because they were discussed in global meetings, (*id.* ¶ 40), but Plaintiff does not allege CW1 attended those global meetings. So, these allegations do not satisfy the PSLRA pleading requirements.

Plaintiff also includes allegations related to weekly product management meetings which Mr. Goel attended. (*Id.* ¶ 41.) Plaintiff's allegation CW1 "frequently voiced concerns during these meetings" provides a basis for CW1's participation in these meetings and therefore their personal knowledge. (*Id.*) But for the most part, Plaintiff's allegations regarding discussions in the weekly product management meetings are "unreliable" and "vague hearsay." *See Zucco*, 552 F.3d at 996-97. For example, Plaintiff alleges in these meetings "PubMatic's problems with DSPs were [] discussed," "there were huge projects" to "address the leakage of revenue related to TTD," and "it was clear that PubMatic was 'in a lot of danger' because of the Company's problems with DSPs." (Dkt. No. 38 ¶ 41.) Because Plaintiff does not allege any details about what aspects of the

problems were discussed or what the projects entailed, or allege who made the statements CW1 describes, Plaintiff's allegations are insufficient to "satisfy [the] reliability standard." *See Zucco*, 552 F.3d at 997 (holding allegation of "hearsay, accompanied by no details describing which projects or what employees were affected, is not detailed enough to pass muster").

Plaintiff's only allegations which identify speakers are the allegations CW1 and Mr. Janes "frequently voiced concerns during these meetings regarding these issues," and Mr. Janes, "in particular, was 'very vocal' during these meetings in stating that [PubMatic's] publishing demand was decreasing and that PubMatic faced serious challenges related to revenue as a result." (*Id.* ¶ 41.) But that PubMatic had heard "concerns . . . regarding these issues," or that "publishing demand was decreasing" and causing "serious challenges related to revenue," is insufficient to give rise to a strong inference PubMatic knew TTD, a buyer, was reducing its spend on its platform. *See New Mexico State Inv. Council*, 641 F.3d at 1095 (requiring a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

Plaintiff's contention "'the fact that a confidential witness reports hearsay does not automatically disqualify his statement from consideration in the scienter calculus'" is unavailing. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (quoting *Zucco*, 552 F.3d at 997 n.4). As the Ninth Circuit explained in *Lloyd* and *Zucco*, rather than automatically disqualifying hearsay statements, courts "examine a confidential witness's hearsay report to determine if it is sufficiently reliable, plausible, or coherent." *See id.* (quoting *Zucco*, 552 F.3d at 997 n.4). And unlike the cases Plaintiff cites, Plaintiff's complaint does not allege facts making CW1's hearsay reports reliable. *See, e.g.*, *Alghazwi v. Beauty Health Co.*, 801 F. Supp. 3d 982, 1007 (C.D. Cal. 2025) (holding hearsay reports from confidential witnesses reliable when the complaint also "include[d] copies of the written communications through which the [confidential witnesses] learned the information"); *In re BioMarin Pharm. Inc. Sec. Litig.*, No. 3:20-CV-06719-WHO, 2022 WL 164299, at *11 (N.D. Cal. Jan. 6, 2022) (holding confidential witness statements reliable when the witness "named the person from whom the information came" and the witness's allegations aligned "with what [the defendant's] executives [later] publicly admitted"); *City of*

*Miami Gen. Emps. & Sanitation Emps. Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1045 n.10 (N.D. Cal. 2018) (rejecting the defendants' hearsay argument when "many of the CWs had firsthand knowledge of the events and company procedures which form the basis for their statements").

Ultimately, Plaintiff asserts "[r]equiring more detail than those presently alleged would transform the PSLRA's formidable pleading requirement into an impossible one," and "Defendants' argument that Plaintiffs alleged insufficient particularized facts . . . asks the court to impose an impossibly high burden on securities action plaintiffs." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769 (9th Cir. 2023). But Plaintiff does not explain why alleging more detail would be impossible. And *Glazer Capital Management, L.P.*, in which the court cited statements from fifteen separate confidential witnesses, several of whom corroborated each other's accounts and included numbers and other details indicating reliability, *id.* at 768-69, is not analogous to Plaintiff's complaint, which relies on a single confidential witness and generally omits facts supporting that witness's personal knowledge.

So, CW1's statements do not satisfy the PSLRA pleading requirements, and Plaintiff cannot rely on them to allege a strong inference of Defendants' scienter.

**2. Core Operations Inference**

Plaintiff also alleges "the core operations inference, among other things, demonstrates that Defendants made their misrepresentations and half-truths with scienter." (Dkt. No. 38 ¶ 44.)

"The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citation omitted). The core operations theory "may support a strong inference of scienter" when: (1) if read together with other allegations, they "raise an inference of scienter that is cogent and compelling [and] thus strong in light of other explanations"; (2) "they are particular and suggest that defendants had actual access to the disputed information"; or (3) "in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* (cleaned up). But "proof under this theory is not easy"; a plaintiff must "produce either specific admissions by one or more corporate executives of detailed

United States District Court
Northern District of California

involvement in the minutia of a company's operations, such as data monitoring, . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.* (citations omitted).

Plaintiff alleges the core operations inference applies because "PubMatic indicated in various SEC filings" TTD was one of its two largest DSP relationships and, with Google DV360, "account[s] for a significant portion of the ad impressions purchased on [its] platform." (Dkt. No. 38 ¶ 44.) Plaintiff also alleges "PubMatic indicated in various SEC filings" it "generate[s] revenue from . . . the purchase and sale of digital advertising inventory" and its "revenue and results of operations are highly dependent on the overall demand for advertising." (*Id.*) As an initial matter, Plaintiff's core operations theory fails because Plaintiff "does not state with specificity what it is that the defendants must have known." *See Chicago & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, No. 24-CV-00898-VC, 2025 WL 82206, at *2 (N.D. Cal. Jan. 13, 2025) (rejecting the plaintiff's reliance on the core operations inference because "it's not clear what [the defendants] would have actually known—or that what they knew meant that they made the allegedly misleading statements with knowledge or deliberate recklessness"). But even if Plaintiff had done so, Plaintiff does not allege any facts imputing that knowledge to a PubMatic executive. *See Intuitive Surgical, Inc.*, 759 F.3d at 1062 (requiring "specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports"). Plaintiff's assertion his allegations "undisputably establish that the facts alleged relate to PubMatic's core operations and thus add to the strong inference of scienter alleged" is not persuasive. (Dkt. No. 42 at 27.) Plaintiff therefore has not alleged facts to show he can rely on the core operations inference to allege scienter.

***

So, Plaintiff does not include any allegations which, "standing alone, are sufficient to create a strong inference of scienter." *See Zucco*, 552 F.3d at 992. As to the "holistic review," Plaintiff does not allege any facts supporting Mr. Pantelick's scienter, Plaintiff's allegations supporting Mr. Goel's scienter are based exclusively on unreliable statements from CW1, and

Plaintiff presents no allegations plausibly supporting his assertion of the core operations theory, so Plaintiff's "insufficient allegations" do not "combine to create a strong inference" of scienter. *Id.* (cleaned up). The Court therefore also dismisses Plaintiff's complaint because he does not adequately allege Defendants' scienter.

**C. Section 20(a) Claim**

Plaintiff also alleges Individual Defendants are liable under section 20(a) of the Exchange Act. (Dkt. No. 38 ¶¶ 73-77.) To state a prima facie section 20(a) claim, a plaintiff must plead: (1) "a primary violation of federal securities laws"; and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because Plaintiff fails to plead a primary violation of section 10(b), the Court dismisses the section 20(a) claims against Individual Defendants. *See Zucco*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

**CONCLUSION**

For the reasons stated above, the Court GRANTS Defendants' motion to dismiss. However, because Plaintiff may be able to plausibly allege Defendants' material omissions and requisite scienter in making them, the Court gives Plaintiff leave to amend. Plaintiff's amended complaint is due **September 4, 2026**. Plaintiff may not add new defendants or claims without leave of Court.

This Order disposes of Docket No. 39.

**IT IS SO ORDERED.**

Dated: July 27, 2026

Jacqueline Scott Corley
JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California