Robert V. Prongay (SBN 270796)
*rprongay@glancylaw.com*
Ex Kano S. Sams II (SBN 192936)
*esams@glancylaw.com*
Charles H. Linehan (SBN 307439)
*clinehan@glancylaw.com*
Pavithra Rajesh (SBN 323055)
*prajesh@glancylaw.com*
GLANCY PRONGAY WOLKE & ROTTER LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Sidney Hsu and for the Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SIDNEY HSU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PUBMATIC, INC., RAJEEV K. GOEL, and STEVEN PANTELICK,<br><br>Defendants. | Case No. 3:25-cv-07067-JSC<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Lead Plaintiff Sidney Hsu ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things: (1) a review of United States Securities and Exchange Commission ("SEC") filings by PubMatic, Inc. ("PubMatic" or the "Company"); (2) a review of securities analysts' reports and advisories about the Company; (3) analysis of press releases, media reports, and other public statements issued by, or about, the Company; (4) interviews of former Company employees and other individuals with knowledge of the allegations herein; and (5) analysis of other information regarding the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a securities class action on behalf of all persons and entities who purchased the Company's common stock between February 27, 2025 and August 11, 2025, inclusive ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. PubMatic is a technology company that enables real time programmatic advertising transactions for advertisers, agencies, and demand side platforms ("DSPs"). Programmatic advertising purportedly enables buyers to purchase ad impressions on publisher supplied inventory within milliseconds in a sophisticated, technology-driven marketplace. The Company primarily generates its revenue from the use of its platform for the purchase and sale of digital advertising inventory.

3. On August 11, 2025, PubMatic released its second quarter 2025 financial report. In its report, PubMatic's Chief Financial Officer ("CFO"), Steven Pantelick ("Pantelick"), revealed that the Company's outlook reflected "***a reduction in ad spend from one of [its] top DSP partners.***" The Company's Chief Executive Officer ("CEO"), Rajeev Goel ("Goel"), further revealed that a "top DSP buyer" had "shifted a significant number of clients to a new platform that evaluates inventory differently" causing significant headwinds. In response to the inventory valuation change, CEO Goel stated further that the Company would "need to do a better job . . . to prioritize across all

the hundreds of billions of daily ad impressions that we have, which subset of those impressions that we send to this DSP."

4. On this news, PubMatic's stock price fell $2.23, or 21.1%, to close at $8.34 per share on August 12, 2025, on unusually heavy trading volume.

5. As demonstrated herein, Defendants had long known about the Company's DSP problems before the Company's August 11, 2025 press release. Indeed, the Company's DSP problems were discussed in internal global meetings and weekly product management meetings that were attended by CEO Goel. For example, in 2024, PubMatic saw a big impact on monetization because of the Company's problems with DSPs, and it was evident at that time that PubMatic was not growing as fast as it had in previous years. Additionally, in 2024, there were huge projects around the reprioritization of traffic to The Trade Desk that made it clear that PubMatic was experiencing significant risks because of the Company's problems with DSPs. In fact, Company employees frequently expressed concerns during these meetings regarding these issues and conveyed that the Company's publishing demand was decreasing and that PubMatic faced serious challenges related to revenue as a result.

6. Moreover, as indicated by a former company employee, internal Company documents further demonstrate that Defendants were aware of, and had access to, information showing the adverse effects that the Company's problems with DSPs were having upon PubMatic's financial results. For instance, PubMatic's minutes for the Company's global meetings and weekly product management meetings reflect discussions related to PubMatic's problems with DSPs in general and with The Trade Desk in particular. Additionally, internal revenue reports demonstrate a decrease in the Company's revenue from DSPs, which Defendants tracked daily.

7. Thus, throughout the Class Period, Defendants made materially false and misleading statements and half-truths, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that a top DSP buyer was shifting a significant number of clients to a new platform that evaluated inventory differently; (2) that, as a result, PubMatic was seeing a reduction in ad spend and revenue from this top DSP buyer; and (3) that, as a result of the foregoing, Defendants' positive statements

about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

8. As a result of Defendants' misrepresentations and half-truths and the significant decline in the price of the Company's common stock, Plaintiff and other Class members suffered substantial losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

11. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

12. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

13. As set forth in the previously filed certification that is incorporated by reference herein (ECF No. 1 at 22-23), Plaintiff purchased the Company's common stock during the Class Period and has been damaged thereby.

14. Defendant PubMatic is incorporated under the laws of Delaware. The Company maintains a headquarters location in Redwood City, California. PubMatic's common stock trades on the NASDAQ exchange under the symbol "PUBM."

15. Defendant Rajeev K. Goel ("Goel") was the Company's CEO at all relevant times.

16. Nonparty Steven Pantelick ("Pantelick") was the Company's CFO at all relevant times.

17. Defendants PubMatic and Goel are collectively referred to herein as "Defendants."

18. CEO Goel is liable as a direct participant in the wrongs alleged herein. In addition, by reason of his status as a senior executive officer and/or director, CEO Goel was a controlling person within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of his position of control, CEO Goel was able to, and did, directly or indirectly, control the conduct of the Company's business.

19. Because of his position within the Company, CEO Goel controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. In addition, CEO Goel was provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, CEO Goel had the opportunity to commit the fraudulent acts alleged herein.

20. Moreover, as a senior executive officer and/or director – and as a controlling person of a publicly-traded company whose common stock was, and is, governed by the federal securities laws, CEO Goel had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects. Additionally, CEO Goel also had a duty to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's common stock would be based upon truthful and accurate information. Defendants' misrepresentations and half-truths during the Class Period violated these specific requirements and obligations.

21. CEO Goel is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain

additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

22. PubMatic contends that its mission is to fuel the potential of Internet content creators by providing an advertisement-funded Internet. The Company represents that its integrated technology platform empowers content creators (which it refers to as "publishers") across the Internet to maximize monetization of their advertising inventory. PubMatic also claims that its platform provides control and transparency to buyers, which includes advertisers, agencies, agency trading desks, and DSPs (which it collectively refer to as "buyers").

23. PubMatic suggests that the challenges of scale and the complexity of the digital advertising ecosystem require an automated, fast, and efficient approach to purchasing ads online, known as programmatic advertising. According to the Company, programmatic advertising, on an automated basis, enables buyers to purchase ad impressions on publisher supplied inventory within milliseconds in a sophisticated, technology-driven marketplace. PubMatic claims that with header bidding (which enables a single parallel auction by a publisher with multiple interested parties simultaneously), the industry has seen a significant increase in the number of ad impressions that need to be processed and analyzed in real-time by each participant in the digital advertising ecosystem.

24. Additionally, PubMatic contends that as consumers increasingly engage with digital media – and as advertisers bid on a growing array of ad formats and impressions – an immense amount of data is generated. According to PubMatic, this data includes anonymized consumer information about interests and intent, log files of winning and losing advertiser bids, and transaction records for billing and payment reconciliation. The Company claims that technology infrastructure platforms must rapidly process this data while offering a seamless digital ad experience. According to PubMatic, companies must continue to innovate and find efficiencies in their data processing

(including through the use of machine learning and artificial intelligence) to maintain pace with growing volumes of transactions to maintain profitability.

25. PubMatic generates revenue from the use of its platform for the purchase and sale of digital advertising inventory. The Company works primarily with publishers and app developers who allow PubMatic direct access to their ad inventory, as well as select channel partners that meet the Company's quality and scale thresholds. PubMatic's channel partners aggregate and provide further access to thousands of sites and apps from smaller publishers. The Company generates revenue through fees charged to its publishers, which are generally a percentage of the value of the advertising impressions that publishers monetize on the Company's platform. PubMatic also generates revenues from its other products such as OpenWrap, its header bidding solution, and Connect, its solution that provides additional data and insights to buyers, which are sold separate from, or in conjunction with, use of its platform. To facilitate the sale of publisher inventory, PubMatic enters into written service agreements with its buyers, primarily DSPs, that allow them to use the Company's platform to buy ad inventory. As of December 31, 2024, the Company had 1,049 employees, of whom 319 were located in the United States, 604 in India, and 126 in other offices around the world.

**<u>Defendants' False and Misleading Statements and Insider Sales</u>**

26. On February 27, 2025, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2024 ("2024 Form10-K"). Within the 2020 Form 10-K, Defendants stated the following:

> ***If our existing customers do not expand their usage of our platform, or if we fail to attract new publishers and buyers, our growth will suffer.***

27. The 2024 Form 10-K also stated the following:

> ***Any disruptions in our relationships with premium publishers, buyers, or our largest channel partners could adversely affect our business, results of operations, and financial condition. If we cannot retain or add individual publishers with valuable ad impressions, or if such publishers decide not to make their valuable ad impressions available to us, then our buyers may be less inclined to use our platform, which could adversely affect our business, results of operations, and financial condition.***

28. Additionally, the 2024 Form 10-K further stated the following in relevant part:

> ***We expect to face challenges, risks, and difficulties frequently experienced by growing companies in rapidly developing industries, including those relating to***:
>
> - changes in demand and pricing for ad impressions sold on our platform;
> - changes in our access to valuable ad impressions from publishers;
> - responding to evolving industry standards and government regulations that impact our business, particularly in the areas of data protection and consumer privacy;
> - ***developing, maintaining, and expanding relationships with publishers, DSPs, agencies, advertisers, and buyers***;
> - seasonality in our business;
> - innovating and developing new solutions that are adopted by and meet the needs of publishers, DSPs, agencies, advertisers, and buyers;
> - competing against companies with a larger customer base or greater financial or technical resources;
> - changes in the structure of the buying and selling of ad impressions;
> - changes in the pricing policies of publishers and competitors;
> - changes in demand due to changes in macroeconomic environment, including as a result of an economic downturn, recession, inflation, changes in interest rates or foreign exchange rates, disruptions to supply chains, or otherwise;
> - further expanding our business internationally; and
> - recruiting, integrating, and retaining qualified and motivated employees, particularly engineers.
>
> ***Any one or more of the factors above may result in significant fluctuations in our results of operations***.

29. Defendants' statements in ¶¶26-28 were false and misleading because Defendants misleadingly represented that a reduction in PubMatic's advertising spend could adversely affect the Company's business when CEO Goel knew, or was deliberately reckless in not knowing, that such risks had already materialized. Indeed, contrary to Defendants' representations that ***"[i]f*** our existing customers do not expand their usage of our platform, or ***if*** we fail to attract new publishers and buyers, our growth will suffer" and that "***[i]f*** we cannot retain or add individual publishers with valuable ad impressions, or ***if*** such publishers decide not to make their valuable ad impressions available to us, then our buyers may be less inclined to use our platform, which could adversely affect our business, results of operations, and financial condition," CEO Goel already knew, or was

deliberately reckless in not knowing, that The Trade Desk informed PubMatic in 2024 that PubMatic was being de-prioritized.

30. For example, the account of a Company Confidential Witness ("CW") 1 demonstrates that CEO Goel knew, or was deliberately reckless in not knowing, that The Trade Desk informed PubMatic in 2024 that PubMatic was being de-prioritized. CW1 worked as a Director of Global Support from August 2019 to June 2020 and as a Senior Director of Customer Enablement from June 2020 until April 2025. As Senior Director of Customer Enablement, CW1 managed the Company's platform capacity and oversaw the way PubMatic allocated space to publishers. CW1 reported to Jaan Janes ("Janes"), the Company's former Vice President of Publisher Partnerships. During CW1's tenure, CW1 oversaw issues related to the Company's inventory. In addition to contact during Company meetings, CW1 had frequent, almost daily contact with both CEO Goel and CFO Pantelick in CW1's early years at the Company, but less so subsequently.

31. CW1 stated that the Company's DSP problems were discussed in global meetings, which originally occurred weekly on Mondays and subsequently occurred monthly. CW1 personally attended the Company's global meetings. CW1 stated that these global meetings were also attended by CEO Goel as well as the Company's Vice President of Product Management. CW1 also stated that most executives involved with PubMatic's revenue participated in the Company's global meeting, including Chief Revenue Officer Kyle Dozeman and Executive Vice President of Product Nichant Khathri (who was focused on revenue optimization and, to that end according to CW1, was always working to update the back end of the Company's systems). CW1 stated that in 2024, PubMatic saw a big impact on monetization because of the Company's problems with DSPs in general, and with The Trade Desk in particular, and that it "was clear" that PubMatic was not growing as fast as it had in previous years. CW1 stated that CEO Goel was aware of problems with revenue optimization with The Trade Desk because he participated in both the Company's global meetings and weekly product management meetings during which the participants discussed these issues.

32. CW1 stated further that PubMatic's problems with DSPs in general – and with The Trade Desk in particular – were also discussed in weekly product management meetings, which were held on Wednesdays. CW1 personally attended PubMatic's weekly product management meetings. CEO Goel also attended the Company's weekly product management meetings in addition to PubMatic's global meetings.

33. During PubMatic's weekly product management meetings, CW1 stated that the participants at the meetings spent almost all of 2024 trying to ascertain how to get revenue from DSPs to stop leaking. CW1 stated that during these meetings, the issues discussed related to the declines in the Company's revenue were "pervasive." For example, CW1 stated that in 2024, the participants at the weekly product management meetings determined that PubMatic did not perform well with video inventory in the new area of Connected TV ("CTV"), which sustained premium rates. CTV devices include Smart TVs, streaming sticks and boxes, and gaming consoles. According to CW1, everything other than CTV became just a commodity and was considered "cheap." CW1 stated that the Company's competitors like Magnite focused on developing video inventory, which was "premium." In contrast, according to CW1, PubMatic maintained its historical focus on banner advertisements, which had accounted for much of the Company's revenue in previous years.

34. CW1 indicated that during the Company's weekly product management meetings going back to 2024, there were huge projects around the reprioritization of traffic to The Trade Desk. CW1 described that in digital advertising, typically the technology involved will favor making money at any cost. However, according to CW1, to address the leakage of revenue related to The Trade Desk, PubMatic optimized things in favor of The Trade Desk to the point that the Company was "giving away money" to The Trade Desk. For example, CW1 stated that PubMatic's customer success team created huge projects in 2024 intended to make the Company's inventory attractive to The Trade Desk. According to CW1, however, these projects merely consisted of cutting PubMatic's margins by 20-30% to give The Trade Desk a discounted rate to try to win back business from The Trade Desk. CW1 stated that CEO Goel oversaw these strategies to try to win back business from The Trade Desk. As a result, CW1 stated that it was clear to participants at the

Company's weekly product management meetings in 2024 that PubMatic was "in a lot of danger" because of the Company's problems with The Trade Desk.

35. Additionally, CW1 stated that during PubMatic's weekly product management meetings, the participants discussed the fact that The Trade Desk was prioritizing competitors who were more competent in CTV, and that these market shifts drastically affected the value of the Company's existing inventory. CW1 said, therefore, The Trade Desk was prioritizing competitors in 2024 who were more competent in CTV and was de-prioritizing PubMatic because the Company was less competent in CTV. According to CW1, as a result, banner ads became "cheap" and were increasingly considered "junky." Thus, in 2024, CW1 stated that PubMatic's banner inventory that had previously sold for $50 each would bring in less than one dollar.

36. CW1 stated further that during PubMatic's weekly product management meetings in 2024, CEO Goel was furious at The Trade Desk because The Trade Desk had cut off PubMatic. CW1 stated that the Company's monetization team had asked CEO Goel to intervene to address the problems that PubMatic was experiencing with The Trade Desk. CW1 stated that during the Company's weekly product management meetings that CW1 and CEO Goel attended in 2024, the Company's monetization, product, and customer success teams met to discuss how PubMatic could mitigate the negative financial impacts from The Trade Desk's decision to circumvent business around PubMatic.

37. CW1 also stated that during a weekly product management meeting in 2024, CEO Goel was demoralized while conveying a conversation he had with The Trade Desk. Specifically, CEO Goel told the meeting participants that The Trade Desk told CEO Goel that PubMatic "just wasn't big enough for The Trade Desk to care about." CW1 stated that during a subsequent meeting, CEO Goel lamented that "maybe I should have let them win at golf."

38. Additionally, CW1 stated that former Vice President of Publisher Partnerships Janes, Amit Jamdade ("Jamdade") (the former Senior Director of Customer Success), and CW1 frequently voiced concerns during the weekly product management meetings regarding these issues. CW1 stated that Janes, in particular, was "very vocal" during these meetings in stating that the Company's

publishing demand was decreasing and that PubMatic faced serious challenges related to revenue as a result.

39. Furthermore, CW1 stated that internal Company documents demonstrate that CEO Goel was aware of, and had access to, information demonstrating the adverse effects that the Company's problems with DSPs and The Trade Desk were having upon PubMatic's financial results. According to CW1, PubMatic's minutes for the global meetings reflected discussions related to PubMatic's problems with DSPs in general and with The Trade Desk in particular. CW1 also stated that minutes of the Company's weekly product management meetings documented these problems and issues with respect to areas focused on monetization. CW1 indicated further that internal revenue reports reflected a decrease in the Company's revenue from DSPs, which Defendants tracked daily. According to CW1, "the warning signs were there." Indeed, contrary to Defendants' suggestion that issues related to "developing, maintaining, and expanding relationships with publishers, DSPs, agencies, advertisers, and buyers" . . . "***may*** result in significant fluctuations in our results of operations," CW1 stated that the Company was already experiencing DSP problems in general, and with The Trade Desk in particular, in 2024 as discussed in global and weekly product management meetings, which CW1 and CEO Goel personally attended. Thus, Defendants' statements misled investors by identifying these risks as merely potential risks when, in fact, the events that existed as risks had actually occurred.

40. Additionally, CEO Goel's statements at the end of the Class Period further demonstrate why Defendants' statements were false and misleading. For instance, during the conference call on August 11, 2025, CEO Goel had the following exchange with an analyst:

> **Jason Helfstein** - Oppenheimer & Co Inc - Analyst
>
> And what made it like specific to this DSP like best to understand like how you – if your decision on what was valuable inventory was fine for everybody else, why was it not fine for this DSP suddenly?
>
> **Rajeev Goel** - PubMatic Inc - Chief Executive Officer, Co-Founder, Director
>
> Yes. Our view is it was precipitated by a shift in clients that this DSP has from one platform to a different platform, and that shift corresponded with the quarter boarder. So we saw that impact starting in July.

41. Importantly, CEO Goel ***did not*** claim that the shift in clients that this DSP had from one platform to a different platform occurred in July 2025. Rather, CEO Goel stated that PubMatic purportedly saw the ***impact*** of that shift in July 2025. Indeed, on June 6, 2023, The Trade Desk issued a press release entitled "The Trade Desk Launches Kokai – a New Media Buying Platform that Brings the Full Power of AI to Digital Marketing" which indicated that the shift that CEO Goel was referring to that The Trade Desk made from Solimar to Kokai occurred in 2023. CEO Goel's statement, therefore, corroborates the account of CW1, who stated that CEO Goel attended the Company's global meetings and weekly product management meetings in which discussions were held regarding the problems that PubMatic experienced with The Trade Desk long before PubMatic purportedly observed the financial ***impact*** of that shift in July 2025.

42. On March 3, 2025 – only four days after PubMatic issued its 2024 Form 10-K – CFO Pantelick sold 4,000 shares of PubMatic stock at an average share price of $10.61 for proceeds of $42,440.

43. On April 1, 2025, CEO Goel sold 25,000 shares of PubMatic stock at an average share price of $9.14 for proceeds of $228,500.

44. The next day – on April 2, 2025 – CEO Goel sold 33,213 shares of PubMatic stock at an average share price of $9.31 for proceeds of $309,213. On the same day, CFO Pantelick sold 12,061 shares of PubMatic stock at an average share price of $9.31 for proceeds of $112,288.

45. The following day – April 3, 2025 – CFO Pantelick sold 18,384 shares of PubMatic stock at an average share price of $8.45 for proceeds of $155,345.

46. On May 5, 2025, CEO Goel sold 25,000 shares of PubMatic stock at an average share price of $9.84 for proceeds of $246,000. On the same day, CFO Pantelick sold 4,000 shares of PubMatic stock at an average share price of $9.83 for proceeds of $39,320.

47. On May 8, 2025, the Company filed its Form 10-Q for the quarter ended March 31, 2025 ("1Q25 Form 10-Q"). Within the 1Q25 Form 10-Q, Defendants stated, in relevant part, the following:

> ***We expect to face challenges, risks, and difficulties frequently experienced by growing companies in rapidly developing industries, including those relating to***:

- changes in demand and pricing for ad impressions sold on our platform;
- changes in our access to valuable ad impressions from publishers;
- responding to evolving industry standards and government regulations that impact our business, particularly in the areas of data protection and consumer privacy;
- ***developing, maintaining, and expanding relationships with publishers, DSPs, agencies, advertisers, and buyers***;
- seasonality in our business;
- changes in demand due to real or perceived economic stagnation or recession in certain markets;
- innovating and developing new solutions that are adopted by and meet the needs of publishers, DSPs, agencies, advertisers, and buyers;
- competing against companies with a larger customer base or greater financial or technical resources;
- changes in the structure of the buying and selling of ad impressions;
- changes in the pricing policies of publishers and competitors;
- changes in the bidding behavior of buyers of ad impressions;
- changes in demand due to changes in macroeconomic environment, including as a result of an economic downturn, recession, inflation, volatility in interest rates or foreign exchange rates, disruptions to supply chains, disruptions to global trade, or otherwise;
- further expanding our business internationally; and
- recruiting, integrating, and retaining qualified and motivated employees, particularly engineers.

***Any one or more of the factors above may result in significant fluctuations in our results of operations.***

48. The statements above in ¶47 in PubMatic's 1Q25 Form 10-Q were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, contrary to Defendants' suggestion that issues related to "developing, maintaining, and expanding relationships with publishers, DSPs, agencies, advertisers, and buyers" . . . "***may*** result in significant fluctuations in our results of operations," as noted above, CW1 stated that the Company was already experiencing DSP problems in general, and with The Trade Desk in particular, in 2024 as discussed in global and weekly product management meetings,

which CW1 and CEO Goel personally attended. Accordingly, Defendants' misrepresentations identified these risks as mere possibilities when, in fact, the risks had already materialized.

49. For instance, CW1 stated that in 2024, PubMatic saw a big impact on monetization because of the Company's problems with DSPs in general, and with The Trade Desk in particular, and that it "was clear" that PubMatic was not growing as fast as it had in previous years. CW1 stated that CEO Goel was aware of problems with revenue optimization with The Trade Desk because he participated in both the Company's global meetings and weekly product management meetings during which the participants discussed these issues. CW1 stated further that PubMatic's problems with DSPs in general – and with The Trade Desk in particular – were also discussed in weekly product management meetings. During PubMatic's weekly product management meetings, CW1 stated that the participants at the meetings spent almost all of 2024 trying to ascertain how to get revenue from DSPs to stop leaking.

50. Indeed, CW1 stated that during these meetings, the issues discussed related to the declines in the Company's revenue were "pervasive." For example, CW1 stated that in 2024, the participants at the weekly product management meetings determined that PubMatic did not perform well with video inventory in the new area of CTV, which sustained premium rates. According to CW1, everything else became just a commodity and was considered "cheap." CW1 stated that the Company's competitors like Magnite focused on developing video inventory, which was "premium," whereas PubMatic maintained its historical focus on banner advertisements.

51. CW1 also indicated that during the Company's weekly product management meetings going back to 2024, there were huge projects around the reprioritization of traffic to The Trade Desk. CW1 described that in digital advertising, typically the technology involved will favor making money at any cost. However, according to CW1, to address the leakage of revenue related to The Trade Desk, PubMatic optimized things in favor of The Trade Desk to the point that the Company was "giving away money" to The Trade Desk. For example, CW1 stated that PubMatic's customer success team created huge projects in 2024 intended to make the Company's inventory attractive to The Trade Desk. According to CW1, however, these projects merely consisted of cutting PubMatic's margins by 20-30% to give The Trade Desk a discounted rate to try to win back

business from The Trade Desk. CW1 stated that CEO Goel oversaw these strategies to try to win back business from The Trade Desk. As a result, CW1 stated that it was clear to participants at the Company's weekly product management meetings in 2024 that PubMatic was "in a lot of danger" because of the Company's problems with The Trade Desk.

52. Additionally, CW1 stated that during PubMatic's weekly product management meetings, the participants discussed the fact that The Trade Desk was prioritizing competitors who were more competent in CTV, and that these market shifts drastically affected the value of the Company's existing inventory. According to CW1, as a result, banner ads became "cheap" and were increasingly considered "junky." Thus, in 2024, CW1 stated that PubMatic's banner inventory that had previously sold for $50 each would bring in less than one dollar.

53. CW1 stated further that during PubMatic's weekly product management meetings in 2024, CEO Goel was furious at The Trade Desk because The Trade Desk had cut off PubMatic. CW1 stated that the Company's monetization team had asked CEO Goel to intervene to address the problems that PubMatic was experiencing with The Trade Desk. CW1 stated that during the Company's weekly product management meetings that CW1 and CEO Goel attended, the Company's monetization, product, and customer success teams met to discuss how PubMatic could mitigate the negative financial impacts from The Trade Desk's decision to circumvent business around PubMatic.

54. CW1 also stated that during a weekly product management meeting in 2024, CEO Goel was demoralized while conveying a conversation he had with The Trade Desk. Specifically, CEO Goel told the meeting participants that The Trade Desk told CEO Goel that PubMatic "just wasn't big enough for The Trade Desk to care about."

55. Additionally, CW1 stated Janes, Jamdade, and CW1 frequently voiced concerns during the weekly product management meetings regarding these issues. CW1 stated that Janes, in particular, was "very vocal" during these meetings in stating that the Company's publishing demand was decreasing and that PubMatic faced serious challenges related to revenue as a result.

56. Additionally, CEO Goel's statements at the end of the Class Period further demonstrate why Defendants' statements were false and misleading. For instance, during the conference call on August 11, 2025, CEO Goel had the following exchange with an analyst:

> **Jason Helfstein** - Oppenheimer & Co Inc - Analyst
>
> And what made it like specific to this DSP like best to understand like how you – if your decision on what was valuable inventory was fine for everybody else, why was it not fine for this DSP suddenly?
>
> **Rajeev Goel** - PubMatic Inc - Chief Executive Officer, Co-Founder, Director
>
> Yes. Our view is it was precipitated by a shift in clients that this DSP has from one platform to a different platform, and that shift corresponded with the quarter boarder. So we saw that impact starting in July.

57. Importantly, CEO Goel ***did not*** claim that the shift in clients that this DSP had from one platform to a different platform occurred in July 2025. Rather, CEO Goel stated that PubMatic purportedly saw the ***impact*** of that shift in July 2025. Indeed, on June 6, 2023, The Trade Desk issued a press release entitled "The Trade Desk Launches Kokai – a New Media Buying Platform that Brings the Full Power of AI to Digital Marketing" which indicated that the shift that CEO Goel was referring to that The Trade Desk made from Solimar to Kokai occurred in 2023. CEO Goel's statement, therefore, corroborates the account of CW1, who stated that CEO Goel attended the Company's global meetings and weekly product management meetings in which discussions were held regarding the problems that PubMatic experienced with The Trade Desk long before PubMatic purportedly observed the financial ***impact*** of that shift in July 2025.

58. On June 2, 2025, CEO Goel sold 25,000 shares of PubMatic stock at an average share price of $11.80 for proceeds of $295,000.

59. The next day – June 3, 2025 – CFO Pantelick sold 4,000 shares of PubMatic stock at an average share price of $12.07 for proceeds of $48,280.

60. On June 9, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $12.13 for proceeds of $533,720.

61. On June 23, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $11.02 for proceeds of $484,880.

62. On July 2, 2025, CEO Goel sold 33,001 shares of PubMatic stock at an average share

price of $12.56 for proceeds of $414,493. On the same day, CFO Pantelick sold 15,598 shares of PubMatic stock at an average share price of $12.54 for proceeds of $195,599.

63. The following day – July 3, 2025 – CFO Pantelick sold 15,690 shares of PubMatic stock at an average share price of $12.82 for proceeds of $201,146.

64. On July 7, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $12.53 for proceeds of $551,320.

65. On July 21, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $12.80 for proceeds of $563,200.

66. On August 1, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $11.28 for proceeds of $496,320.

**The Truth Begins to Emerge**

67. On August 11, 2025, after the market closed, PubMatic issued a press release announcing its financial results for the quarter ended June 30, 2025. The press release stated the following in relevant part:

> While our ***outlook includes a reduction in ad spend from one of our top DSP partners,*** the underlying health of the business remains strong while we mitigate the impact. Additionally, we are optimizing resources to focus on key priorities that include: diversifying DSP mix and accelerating investment on the buy-side, growing CTV, scaling emerging revenue streams, and integrating AI across our tech stack and operations. We have a healthy balance sheet and generate positive cash flow and are confident in the long-term strategy to drive durable, accelerated growth, increased profitability, and maximized shareholder value.

68. On the same day, PubMatic held an earnings call to discuss the quarterly results ("2Q25 Earnings Call"). During the 2Q25 Earnings Call, CEO Goel, stated the following:

> Today, our top legacy DSP partners contribute the majority of ad spend on our platform. Historically, this strategy has delivered growth and scale. ***But platform changes on their end are often done with limited visibility and create revenue headwinds for us while we take steps to mitigate them. The most recent example occurred just last month in July and will impact our revenue in the second half of this year as we work through mitigation initiatives.***

69. Also during the 2Q25 Earnings Call, CFO Pantelick stated the following:

> Looking to the second half of the year, we are confident that we'll continue to see growth in these secular areas. Our end-to-end platform, SPO and recently launched AI-driven solutions are helping customers scale their ad businesses while streamlining their operations. ***At the same time, beginning in July, we saw a headwind emerge from another top DSP buyer, which recently made platform***

> ***changes***. As a result, we saw a notable drop in spend in July from this DSP, which has stabilized in August.

70. Analysts were perplexed by Defendants' explanations. Indeed, analysts peppered Defendants with repeated questions about the "headwind" that PubMatic experienced from one of its top DSP buyers:

> **Matthew Swanson - Rbc Capital Markets - Analyst**
>
> Hey, guys, thanks for taking the question.
>
> Rajeev, I know sometimes you can't give us all the details, ***but anything else you can kind of tell us about the nature of the change from the DSP just because we weren't hearing this from some peers.*** And then also – so it sounds like drop in July, stable in August. What the process is of doing the iterations to optimize activity? And then, Steve, if you could just kind of give us the balance between the DSP and the macro and how you were thinking about guidance, that would be great.
>
> **Rajeev Goel - PubMatic Inc - Chief Executive Officer, Co-Founder, Director**
>
> Yes. Thank you, Matt.
>
> ***So beginning in July, we saw a headwind emerge from a top DSP buyer, which recently shifted a significant number of clients to a new platform that evaluates inventory differently***. And so the parameters of how they value inventory have changed, and we are working to optimize the inventory that we send this DSP accordingly. In addition, for some of our SPO partners, they did not realize until after the changes were made that their SPO strategies were no longer implemented.
>
> And so as a result, they need to reimplement their SPO settings on this DSP's new platform, and that process takes time. ***So accordingly, we saw this notable drop in spend in July, and then we've seen that stabilize in August***.
>
> Now given the scale and complexity of our real-time platform, we anticipate that it will take several months to iterate and optimize the traffic that we send to this DSP. And so while we're doing this, a top priority for us is to accelerate the diversification of ad spend on our platform away from legacy DSPs. And we've been making progress, but we plan to accelerate our strategy. So for instance, in Q2, we expanded the share of spending from DSPs outside of the top 5 with performance marketers and mid-tier DSPs growing 20% year over year, such as MNTN and tvScientific and some China-based DSPs. In July, that same cohort accelerated to over 30% year over year.
>
> And we think generally that there is significant opportunity as advertiser budgets outside of the top 250 advertisers and their holdco representatives is growing significantly faster than the growth rate within that top 250. But it's clear that the concentration of our legacy DSP relationships is a significant factor that's constraining our growth, and we intend to address that head on.
>
> I'll turn it over to Steve.
>
> **Steven Pantelick** - PubMatic Inc - Chief Financial Officer

Sure.

***With respect to the outlook, Matt, the vast majority of the outlook is being influenced by this change by the DSP in July***. Just to give you some additional color. In providing the range, the way that I look at the bottom end of the range, it assumes that the latest trends that we're seeing today continue as such, and there's minimal but some consumer softness from the macro. And of course, the upper end of the range assumes the mitigation efforts take hold and start to improve that spend, and there is limited impact from the macro.

And I think the key point to note for investors is that as a business, we are very focused on moving quickly. Obviously, we have a bias towards action. ***We were surprised. We had limited visibility from this change, but the team is moving very quickly***. And as we demonstrated with the DSP change that occurred mid last year, we worked through that.

And as I commented in the prepared comments, we grew that spend for the first time in July from that DSP. So we're confident we're on the right track.

71. Analysts continued to question Defendants:

**Jason Helfstein - Oppenheimer & Co Inc – Analyst**

***And what made it like specific to this DSP like best to understand like how you – if your decision on what was valuable inventory was fine for everybody else, why was it not fine for this DSP suddenly?***

**Rajeev Goel** - PubMatic Inc - Chief Executive Officer, Co-Founder, Director

***Yes. Our view is it was precipitated by a shift in clients that this DSP has from one platform to a different platform, and that shift corresponded with the quarter boarder. So we saw that impact starting in July***.

72. One analyst questioned PubMatic further, noting that the platform shift that the Company was referring to had been "going on for some time:"

**Robert Coolbrith** - Evercore Inc - Equity Analyst

Great, thank you for taking our questions.

***I think the platform shift that you're talking about has been going on for some time. So just wondering if the triggering event in July was maybe incremental changes to that platform or a large number of your SPO customers finally making that transition or something else? And then finally, any indication of a step-up in activity around direct connects from that DSP?***

And then finally, I guess, second question here would be, if you could just revisit the timelines for potential recovery, both around getting those SPO instructions back up and running and optimizing the traffic shaping. If you could just repeat those, that would be great.

Thank you.

**Rajeev Goel** - PubMatic Inc - Chief Executive Officer, Co-Founder, Director

Sure. Yeah, hey, Rob.

***So I mean, we certainly saw an uptick or significant increase of this activity from the DSP causing the drop in spend in July. So I can't speak to exactly kind of what was their timeline or all the history of changes that they made. But that's what we observed on our platform, which we are -- again, we've stabilized, but are working to improve.*** So there are things that we need to do to shape the traffic accordingly from our platform more to the liking of that DSP. And so we're heavily engaged in that process.

And then I'll turn it over to Steve for the second half of your question.

**Steven Pantelick** - PubMatic Inc - Chief Financial Officer

***Yeah, I mean, just to quickly comment on a little bit more on that color, so that DSP that made that change growing very nicely, double digits in June and then a notable decline negative year over year in July. So there was clearly a shift on their side in terms of how they were valuing inventory in terms of what it matters to them and how their platform operates.***

And remind me the second part, it was --

**Robert Coolbrith** - Evercore Inc - Equity Analyst

I just say the time line you have most -- with the stabilization in August, does that indicate that most of your SPO customers have sort of gotten those instructions back into that platform? And any timeline on the optimization of the traffic shaping and how you're thinking about how long that could take to sort of get back to normal?

**Steven Pantelick** - PubMatic Inc - Chief Financial Officer

Sure.

Well, our teams have absolutely been reaching out to all of our SPO partners, letting them know that this has happened, that they need to go into this platform and to reupload their SPO parameters. And so that's just a process that the SPO partners have to do on this DSP. So that's in process and happening. And it's -- after letting them know, it's largely in their hands.

Now with respect to just the mitigation efforts, when we saw the trends start to really decel in July, obviously, we got all the appropriate folks focused on assessing. And what we saw when we had this significant change a year ago that there is a lot of iteration and testing that needs to be done because this is an incredibly complex ecosystem. You're talking about hundreds of billions of impressions a day that we -- ourselves are processing. And so it takes testing, iterating and then doing it all over again and seeing what works and does it meet the criteria that's been established.

So our approach is we're working hard to mitigate it. I incorporated at the low end of the outlook an assumption that the mitigation efforts are relatively limited in terms of effectiveness this quarter, and we're going to keep working at it.

***I would say that given the important size of this DSP, it's just going to take time. And -- but we are well positioned to continue to work through it. And I really want to emphasize if you step back, this is a situation we have experienced [sic] doing.***

> ***The big challenge here was we didn't have any visibility in terms of the big decel. And so we're obviously reacting pretty quickly.***
>
> Number two, we are in really healthy financial shape. I mean, we have roughly $120 million of cash, no debt. We generate free cash. So we are in this for the long run, and we're confident that we're going to work through this. And in the near term, we are going to double down on the fastest growing areas that we have, diversify our DSP mix, et cetera.
>
> So we believe we're on the right track, and we're going to work through this.

73. Despite Defendants' claims that they were "surprised," analysts continued to press Defendants during the 2Q25 Earnings Call:

> **Eric Martinuzzi - Lake Street Capital Markets LLC – Analyst**
>
> ***And then a follow-up regarding just the fact that you guys were surprised that this large partner changed how it valued the inventory you were sending it, is there a risk that other DSPs come to this same conclusion? In other words, how close are you to these DSPs where this kind of [issue] comes out of nowhere?***
>
> **Rajeev Goel - PubMatic Inc - Chief Executive Officer, Co-Founder, Director**
>
> Yeah.
>
> ***I mean, in general, I think we're pretty close to these DSPs, and it's certainly our goal to be as close to them as possible. And I think it behooves the DSP as well to be continuously sharing feedback with us on what they want to see more of or what they want to see less of or how their advertiser requirements and mix is shifting. So I think, in general, we do quite a good job of being close to these DSPs.***
>
> ***In this case, we are reacting with limited visibility. So we need to certainly look into that and figure out how we can do a better job.***

74. On this news, PubMatic's stock price fell $2.23, or 21.1%, to close at $8.34 per share on August 12, 2025, on unusually heavy trading volume.

75. On August 12, 2025, Scotiabank Global Equity Research issued an analyst report on PubMatic entitled "2Q25 Recap: Decent Second Qtr. Results, but Overshadowed by Poor Guidance for 3Q." The report stated, in relevant part, the following:

> 2Q25 Results Beat, while 3Q25 guidance disappoints. As noted above, PUBM posted a modest beat, but disappointing guidance. Ex-TTD, we've seen largely positive adtech results this quarter, but most have erred on the conservative side when presenting guidance. ***That being said, PUBM's guidance looks more than just conservative, and the market is voicing its displeasure***. PUBM continues to emphasize that growth looks good outside of the DSP client that is reducing spend (mgmt. noted that underlying business - that which excludes the revenue from the buyer - grew ~19% yoy), but ultimately these aren't 1x impacts from legal, or a segment sale, or something similar. This is normal course of business operations, and

> PUBM could very easily see another client tomorrow reduce spend. It's helpful for investors to know when growth will normalize, but to assume that this couldn't happen again should the broader demand environment get tougher would be foolish. Additionally, PUBM may be having trouble optimizing for Kokai - we believe some of the conservatism built in may be related to the learning curve as they optimize for the new platform. One last thing to note is that 3Q24 included ~$5M of political spend - if we assume the midpoint of the guide and back out the political spend, revenues would still be declining yoy. We may not get a completely normal revenue growth cadence for quite a while.

## ADDITIONAL SCIENTER ALLEGATIONS

76. As alleged herein, PubMatic and CEO Goel acted with scienter because they knew, or were deliberately reckless in not knowing, that: (1) the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; and (2) such statements or documents would be issued or disseminated to the investing public. As set forth elsewhere herein in detail, CEO Goel, and PubMatic through the actions, omissions, and scienter of CEO Goel, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of PubMatic's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning PubMatic, participated in the fraudulent scheme alleged herein.

77. In addition to the facts alleged herein, the following facts, which are listed by way of example and not limitation, are additional facts that further support the strong inference of scienter alleged.

### CEO Goel's Access to Information Supports a Strong Inference of Scienter

78. During the Class Period, CEO Goel, as a senior executive officer and/or director of the Company, was privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. As set forth above, CEO Goel had access to material adverse non-public information concerning the Company. Because of his position within the Company, CEO Goel had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof,

and via reports and other information provided to them in connection therewith. Because of his possession of such information, CEO Goel knew, or was deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**Defendants' Own Statements Add to a Strong Inference of Scienter**

79. Additionally, CEO Goel's statements at the end of the Class Period further demonstrate why Defendants' statements were false and misleading. For instance, during the conference call on August 11, 2025, CEO Goel had the following exchange with an analyst:

> **Jason Helfstein** - Oppenheimer & Co Inc - Analyst
>
> And what made it like specific to this DSP like best to understand like how you – if your decision on what was valuable inventory was fine for everybody else, why was it not fine for this DSP suddenly?
>
> **Rajeev Goel** - PubMatic Inc - Chief Executive Officer, Co-Founder, Director
>
> Yes. Our view is it was precipitated by a shift in clients that this DSP has from one platform to a different platform, and that shift corresponded with the quarter boarder. So we saw that impact starting in July.

80. Importantly, CEO Goel ***did not*** claim that the shift in clients that this DSP had from one platform to a different platform occurred in July 2025. Rather, CEO Goel stated that PubMatic purportedly saw the ***impact*** of that shift in July 2025. Indeed, on June 6, 2023, The Trade Desk issued a press release entitled "The Trade Desk Launches Kokai – a New Media Buying Platform that Brings the Full Power of AI to Digital Marketing" which indicated that the shift that CEO Goel was referring to that The Trade Desk made from Solimar to Kokai occurred in 2023. CEO Goel's statement, therefore, corroborates the account of CW1, who stated that CEO Goel attended the Company's global meetings and weekly product management meetings in which discussions were held regarding the shift in clients that The Trade Desk experienced from one platform to a different platform that occurred long before PubMatic purportedly observed the financial ***impact*** of that shift in July 2025.

**The Insider Selling Supports a Strong Inference of Scienter**

81. The stock sales made by CEO Goel and CFO Pantelick during the Class Period add to a strong inference of scienter considering the amount and percentage of shares sold, the timing of

the sales, and their prior trading history. Specifically, during the Class Period, CEO Goel sold 361,214 shares of PubMatic stock for proceeds of $4,122,646. These sales constituted 94% of CEO Goel's holdings. Additionally, during the Class Period, CFO Pantelick sold 73,733 shares of PubMatic stock for proceeds of $794,418. These sales constituted 71% of Pantelick's holdings.

82. Indeed, during the Class Period, CEO Goel and CFO Pantelick made the following sales of Company stock:

- On April 1, 2025, CEO Goel sold 25,000 shares of PubMatic stock at an average share price of $9.14 for proceeds of $228,500;
- On April 2, 2025, CEO Goel sold 33,213 shares of PubMatic stock at an average share price of $9.31 for proceeds of $309,213;
- On May 5, 2025, CEO Goel sold 25,000 shares of PubMatic stock at an average share price of $9.84 for proceeds of $246,000;
- On June 2, 2025, CEO Goel sold 25,000 shares of PubMatic stock at an average share price of $11.80 for proceeds of $295,000;
- On June 9, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $12.13 for proceeds of $533,720;
- On June 23, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $11.02 for proceeds of $484,880;
- On July 2, 2025, CEO Goel sold 33,001 shares of PubMatic stock at an average share price of $12.56 for proceeds of $414,493;
- On July 7, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $12.53 for proceeds of $551,320;
- On July 21, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $12.80 for proceeds of $563,200;
- On August 1, 2025, CEO Goel sold 44,000 shares of PubMatic stock at an average share price of $11.28 for proceeds of $496,320;
- On March 3, 2025, CFO Pantelick sold 4,000 shares of PubMatic stock at an average share price of $10.61 for proceeds of $42,440;
- On April 2, 2025, CFO Pantelick sold 12,061 shares of PubMatic stock at an average share price of $9.31 for proceeds of $112,288;
- On April 3, 2025, CFO Pantelick sold 18,384 shares of PubMatic stock at an average share price of $8.45 for proceeds of $155,345;

- On May 5, 2025, CFO Pantelick sold 4,000 shares of PubMatic stock at an average share price of $9.83 for proceeds of $39,320;
- On June 3, 2025, CFO Pantelick sold 4,000 shares of PubMatic stock at an average share price of $12.07 for proceeds of $48,280;
- On July 2, 2025, CFO Pantelick sold 15,598 shares of PubMatic stock at an average share price of $12.54 for proceeds of $195,599; and
- On July 3, 2025, CFO Pantelick sold 15,690 shares of PubMatic stock at an average share price of $12.82 for proceeds of $201,146.

83. The timing of these sales also supports a strong inference of scienter. For example, on March 3, 2025 – only four days after PubMatic issued its 2024 Form 10-K – CFO Pantelick sold 4,000 shares of PubMatic stock at an average share price of $10.61 for proceeds of $42,440. Additionally, CEO Goel and CFO Pantelick sold substantial amounts of PubMatic stock on the same days. For example, on April 2, 2025 – CEO Goel sold 33,213 shares of PubMatic stock at an average share price of $9.31 for proceeds of $309,213. On the same day, CFO Pantelick sold 12,061 shares of PubMatic stock at an average share price of $9.31 for proceeds of $112,288. Similarly, on May 5, 2025, CEO Goel sold 25,000 shares of PubMatic stock at an average share price of $9.84 for proceeds of $246,000. On the same day, CFO Pantelick sold 4,000 shares of PubMatic stock at an average share price of $9.83 for proceeds of $39,320. Moreover, on July 2, 2025, CEO Goel sold 33,001 shares of PubMatic stock at an average share price of $12.56 for proceeds of $414,493. On the same day, CFO Pantelick sold 15,598 shares of PubMatic stock at an average share price of $12.54 for proceeds of $195,599.

84. The stock sales by CEO Goel and CFO Pantelick were also unusual considering their prior trading histories. For instance, between February 26, 2024 and August 8, 2024, CFO Pantelick sold 43,281 shares of PubMatic stock for proceeds of $949,345 – proceeds that amounted to only 41% of his holdings compared to sales amounting to 71% of his holdings during the Class Period. And although CEO Goel sold 257,056 shares of PubMatic stock between February 26, 2024 and August 8, 2024 for proceeds of $5,172,690, such sales did not occur during a period in which Plaintiff alleges that the Company's stock was artificially inflated because of Defendants' misrepresentations. Thus, these stock sales add to the strong inference of scienter alleged.

**The Core Operations Inference Bolsters the Strong Inference of Scienter Alleged**

85. The core operations inference also adds to the strong inference of scienter alleged because the facts relate to issues about which CEO Goel would have been aware. For example, The Trade Desk was one of PubMatic's top two partners, which together account for more than 50% of platform spending for the Company. Additionally, CEO Goel participated in meetings in which issues related to The Trade Desk were discussed. For instance, CW1 stated that in 2024, PubMatic saw a big impact on monetization because of the Company's problems with DSPs in general, and with The Trade Desk in particular, and that it "was clear" that PubMatic was not growing as fast as it had in previous years. CW1 stated that CEO Goel was aware of problems with revenue optimization with The Trade Desk because he participated in both the Company's global meetings and weekly product management meetings during which the participants discussed these issues. CW1 stated further that PubMatic's problems with DSPs in general – and with The Trade Desk in particular – were also discussed in weekly product management meetings. During PubMatic's weekly product management meetings, CW1 stated that the participants at the meetings spent almost all of 2024 trying to ascertain how to get revenue from DSPs to stop leaking.

86. Indeed, CW1 stated that during these meetings, the issues discussed related to the declines in the Company's revenue were "pervasive." For example, CW1 stated that in 2024, the participants at the weekly product management meetings determined that PubMatic did not perform well with video inventory in the new area of CTV, which sustained premium rates. According to CW1, everything else became just a commodity and was considered "cheap." CW1 stated that the Company's competitors like Magnite focused on developing video inventory, which was "premium." In contrast, according to CW1, PubMatic maintained its historical focus on banner advertisements, which had accounted for much of the Company's revenue in previous years.

87. CW1 also indicated that during the Company's weekly product management meetings going back to 2024, there were huge projects around the reprioritization of traffic to The Trade Desk. CW1 described that in digital advertising, typically the technology involved will favor making money at any cost. However, according to CW1, to address the leakage of revenue related to The Trade Desk, PubMatic optimized things in favor of The Trade Desk to the point that the

Company was "giving away money" to The Trade Desk. For example, CW1 stated that PubMatic's customer success team created huge projects in 2024 intended to make the Company's inventory attractive to The Trade Desk. According to CW1, however, these projects merely consisted of cutting PubMatic's margins by 20-30% to give The Trade Desk a discounted rate to try to win back business from The Trade Desk. CW1 stated that CEO Goel oversaw these strategies to try to win back business from The Trade Desk. As a result, CW1 stated that it was clear to participants at the Company's weekly product management meetings in 2024 that PubMatic was "in a lot of danger" because of the Company's problems with The Trade Desk.

88. Additionally, CW1 stated that during PubMatic's weekly product management meetings, the participants discussed the fact that The Trade Desk was prioritizing competitors who were more competent in CTV, and that these market shifts drastically affected the value of the Company's existing inventory. According to CW1, as a result, banner ads became "cheap" and were increasingly considered "junky." Thus, in 2024, CW1 stated that PubMatic's banner inventory that had previously sold for $50 each would bring in less than one dollar.

89. CW1 stated further that during PubMatic's weekly product management meetings in 2024, CEO Goel was furious at The Trade Desk because The Trade Desk had cut off PubMatic. CW1 stated that the Company's monetization team had asked CEO Goel to intervene to address the problems that PubMatic was experiencing with The Trade Desk. CW1 stated that during the Company's weekly product management meetings that CW1 and CEO Goel attended, the Company's monetization, product, and customer success teams met to discuss how PubMatic could mitigate the negative financial impacts from The Trade Desk's decision to circumvent business around PubMatic.

90. CW1 also stated that during a weekly product management meeting in 2024, CEO Goel was demoralized while conveying a conversation he had with The Trade Desk. Specifically, CEO Goel told the meeting participants that The Trade Desk told CEO Goel that PubMatic "just wasn't big enough for The Trade Desk to care about."

91. Additionally, CW1 stated that Janes, Jamdade, and CW1 frequently voiced concerns during the weekly product management meetings regarding these issues. CW1 stated that Janes, in

particular, was "very vocal" during these meetings in stating that the Company's publishing demand was decreasing and that PubMatic faced serious challenges related to revenue as a result.

**The Account of CW1 Supports a Strong Inference of Scienter**

92. As set forth in detail above, the account of CW1 demonstrates that CEO Goel knew, or was deliberately reckless in not knowing, of the falsity of Defendants' statements and misrepresentations to investors.

**Plaintiff Adequately Alleges Corporate Scienter**

93. As a corporation, PubMatic acted, and could only have acted, through its employees and agents. Accordingly, the scienter of the Company's senior controlling officers may be attributed to PubMatic itself to establish liability as a primary violator of the Exchange Act if such senior officials were acting within the scope of their apparent authority. At all times relevant herein, CEO Goel and CFO Pantelick were senior controlling officers of PubMatic and were acting within the scope of their apparent authority.

**Post Class Period Events**

94. On August 13, 2025, Investing.com published an article entitled "PubMatic's SWOT analysis; adtech firm navigates DSP headwinds amid CTV growth." The article stated in relevant part the following with respect to PubMatic: "a new headwind emerged from a major Demand-Side Platform (DSP) partner, suspected to be The Trade Desk (NASDAQ:TTD), due to a platform change from Solimar to Kokai. This change affected how inventory is valued and led to a decline in year-over-year spend in July after experiencing double-digit growth in June. The impact of this DSP partner change has been significant enough for PubMatic to adjust its future revenue and EBITDA guidance."

**CLASS ACTION ALLEGATIONS**

95. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's common stock during the Class Period, and who were damaged thereby ("Class"). Excluded from the Class are: (a) persons and entities that suffered no compensable losses; and (b)(i) Defendants; (ii) any person who served as a partner, control person, officer, and/or director of the

Company during the Class Period, and members of their immediate families; (iii) present and former parents, subsidiaries, assigns, successors, affiliates, and predecessors of the Company; (iv) any entity in which the Defendants have or had a controlling interest; (v) any trust of which an Individual Defendant is the settler or which is for the benefit of an Individual Defendant and/or member(s) of their immediate families; (vi) Defendants' liability insurance carriers; and (vii) the legal representatives, heirs, successors, and assigns of any person or entity excluded under provisions (i) through (vi) hereof.

96. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on the NASDAQ exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

97. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

98. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

99. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(1) whether Defendants' acts constituted violations of the federal securities laws;

(2) whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(3) whether the price of the Company's common stock was artificially inflated during the Class Period; and

(4) to what extent the members of the Class have sustained damages and the proper measure of damages.

100. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION**

101. As detailed herein, during the Class Period Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's common stock by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's common stock declined significantly as the prior artificial inflation dissipated from the Company's common stock.

102. Specifically, on August 11, 2025, PubMatic released its second quarter 2025 financial report. In the Company's report, Defendants revealed that the Company's outlook reflected "a reduction in ad spend from one of [its] top DSP partners." Defendants further revealed that a "top DSP buyer" had "shifted a significant number of clients to a new platform that evaluates inventory differently" causing significant headwinds. On this news, PubMatic's stock price fell $2.23, or 21.1%, to close at $8.34 per share on August 12, 2025, on unusually heavy trading volume.

103. As a direct result of Defendants' misstatements and omissions alleged herein, the price of the Company's common stock was higher than it would have been but for Defendants' misrepresentations and half-truths. Specifically, Defendants' misstatements and half-truths

increased the price of the Company's common stock, maintained the price, and/or prevented a greater decrease in the price.

104. As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws.

105. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly. These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

106. The declines in the price of the Company's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

107. Additionally, the adverse financial impacts that PubMatic experienced in July 2025, including, but not limited to, a significant reduction in advertising spend from The Trade Desk and reduced revenue and EBITDA guidance, represented a materialization of the risks that CEO Goel knew about, or was deliberately reckless in not knowing, since at least 2024 as alleged more fully herein.

108. Moreover, Defendants' risk disclosures that constituted purported warnings regarding risks that might cause harm to PubMatic's business in the future implicitly served as representations regarding the Company's present state of affairs. Indeed, because the risk disclosures suggested that the circumstances posing the risks had not yet occurred, such disclosures functioned as representations about PubMatic's present state of affairs. As a result, and as alleged more fully herein, such risk disclosures created an impression that differed in a material way from the present state of affairs that actually existed.

109. Thus, the economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE**

110. At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

111. The Company's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ exchange, a highly efficient, electronic stock market;

112. As a regulated issuer, the Company filed periodic public reports with the SEC and the NASDAQ exchange;

113. The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

114. The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

115. As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

116. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## COUNT I
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

117. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

118. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading. These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

119. To the extent that the claims alleged herein are based upon the omission of information, such omissions were made in connection with the misrepresentations and misleading half-truths alleged herein and were not based upon pure omissions.

120. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements

made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

121. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

122. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act Against CEO Goel**

123. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

124. CEO Goel acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, CEO Goel had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

125. CEO Goel, moreover, was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. CEO Goel was provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, CEO Goel had direct and supervisory involvement in the day-to-day operations of the Company and

had the power to control or influence the particular transactions giving rise to the securities violations.

126. CEO Goel also had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public. Thus, CEO Goel is liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained because of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: September 4, 2026

**GLANCY PRONGAY WOLKE & ROTTER LLP**

By: *s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

*Counsel for Lead Plaintiff Sidney Hsu and for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of September, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/ Ex Kano S. Sams II*

Ex Kano S. Sams II